# 23-0619-cv

## United States Court of Appeals
### *for the*
## Second Circuit

LISA McCARTHY, an individual, MAD TRAVEL, INC., AKA Travel Leaders,
VALARIE JOLLY, an individual, WILLIAM RUBINSOHN, on behalf of
themselves and those similarly situated, DBA Rubinsohn Travel, JOHN NYPL,
GO EVERYWHERE, INC., a corporation,

*Plaintiffs-Appellants,*

— v. —

BANK OF AMERICA, N.A., JP MORGAN CHASE & CO., BANK OF
AMERICA CORPORATION, HSBC BANK (USA), N.A., HSBC NORTH
AMERICAN HOLDINGS INC., CITIGROUP, INC., UBS AG, BARCLAYS
PLC, JPMORGAN CHASE BANK, N.A., CITICORP, CITIBANK, N.A.,
BARCLAYS CAPITAL, INC., ROYAL BANK OF SCOTLAND, PLC,

*Defendants-Appellees,*

HSBC FINANCE CORPORATION, ROYAL BANK OF SCOTLAND,
JP MORGAN CHASE BANK, N.A., HSBC HOLDINGS PLC,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## (REDACTED) BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

JOSEPH M. ALIOTO, SR.
ALIOTO LAW FIRM
*Attorney for Plaintiffs-Appellants*
One Sansome Street, 35th Floor
San Francisco, California 94104
(415) 434-8900

## Corporate Disclosure Statement (FRAP 26.1)

Pursuant to the disclosure requirements of Federal Rule of Appellate Procedure 26.1, Appellants Valarie Ann Jolly, Bill Rubinsohn, John Nypl, and Lisa McCarthy are individuals and as such have no parent corporation; Mad Travel Inc. and Go Everywhere Inc. are private corporations and there is no publicly held corporation that owns 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT (FRAP 26.1) ..........................................i

TABLE OF AUTHORITIES.......................................................................................iv

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION ...........................................................................................................1

STATEMENT OF THE ISSUE..................................................................................2

STANDARD OF REVIEW .........................................................................................3

STATUTES AND RULES ...........................................................................................4

STATEMENT OF THE CASE ...................................................................................4

SUMMARY OF ARGUMENT...................................................................................8

FACTUAL AND PROCEDURAL HISTORY ......................................................10

ARGUMENT ...............................................................................................................17

I.      Appellees' Conspiracy To Fix The Two-Way FX Spot Prices By
        Widening The Spread Between Bid And Offer Is Susceptible To
        Generalized Proof Of Causation That Merits Class Certification ......................17

        A.      The District Court's Finding Of "Episodic" And "Multi-
                Directional" Single Price Up-And Down FX Trades Is Clear
                Error And Inconsistent With Its Own Description Of Two-
                Way Bid-Ask Spreads In Its Related *Forex* Order And
                Inconsistent With The *Forex* Jury Verdict And The Plea
                Agreements ...........................................................................................18

        B.      In their June Declarations, Appellees Admitted Direct Common
                Causation In That They Admitted Incorporating The Price-
                Fixed FX Spot Market Prices As Base or Baseline Prices And
                The Principal Component In Their FX Retail Prices ...............................24

        C.      The June Declarations And Saba's Expert Supplemental Report
                Show That Injury-in-Fact Is Susceptible To The Common
                Proof That Appellees Incorporated The Price-Fixed FX Spot
                Market Rates As Base or Baseline Prices And The Primary
                Component In Their FX Retail Rates .........................................................27

D.  It Was Error For The District Court To Reject Appellants' Expert's Common Formula For Calculating Aggregate Damages Since Appellees' Day-To-Day Data Was Not Always Available ........................................................................... 36

E.  The District Court Erred In Rejecting "Purchases" Of FX By Credit Card, Debit Card And Wire From The Case By Denying Appellants Due Process And Disregarding Statutory Tolling, And The Class Is Ascertainable .......................................... 41

F.  The Class Of Purchasers Is Ascertainable As An Objective Criterion And Supercompetitive Is Superfluous Since, Like "Damaged," It Applies To All Members Of The Class Of "Purchasers" ...................................................................... 43

II.  The Summary Judgment Should Be Reversed Since Appellees' Admissions In Their Plea Agreements And June Declarations Raise Triable Issues of Fact And Law Regarding Injury-in-fact and Causation .............................................................................. 44

A.  Since The Plea Agreements, The *Forex* Order, the *Forex* Jury Verdict And *Aiyer* Describe The Widening Of "Two-Way" Bid-Ask Spreads for The EUR/USD Currency Pair, It Was Error For The District Court To Grant Summary Judgment Based On The Fictitious "Episodic" And "Multi-Directional" Theories Wrongly Based On Single Price Up-And-Down FX Manipulation ................................................................. 44

B.  There Are Triable Issues Of Fact And Law As To Whether The District Erred In Requiring Piecemeal, Day-To-Day Tracing Of Transactions Since Appellees Lacked Adequate Day-To-Day Transaction Records And Admitted To A Conspiracy That Corrupted The FX Spot Market In Its Entirety .......................... 46

C.  There is a Triable Issue of Fact And Law As To Whether Appellees' Conspiracy to Eliminate Competition That had a "Direct Effect on Trade and Commerce" Was "Continuous and Uninterrupted" As Admitted in the Plea Agreements ........................ 49

CONCLUSION ................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591, 117 S. Ct. 2231 (1997) ...................................................35

*Beard v. Banks,*
548 U.S. 521 (2006) .........................................................................3

*Bigelow v. RKO Radio Pictures, Inc.,*
327 U.S. 251 (1946) ....................................................................38, 49

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477, 97 S. Ct. 690 (1977) ..................................................36

*Continental Ore Co, et al. v. Union Carbide & Carbon Corp., et al.,*
370 U.S. 690 (1962) .............................................................. 3, 15, 16, 48

*Cordes & Co. Fin. Services v. A.G. Edwards & Sons,*
502 F.3d 91 (2d Cir. 2007) ..........................................................35, 43

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
504 U.S. 451 (1992) .........................................................................3

*Eastman Kodak of New York v. Southern Photo Materials Co.,*
273 U.S 359 (1927) ....................................................................38, 48

*Emich Motors Corporation, et al. v. General Motors Corporation, et al.,*
340 U.S. 558 (1951) .......................................................................13

*Gelboim v. Bank Am. Corp.,*
823 F.3d 759 (2d. Cir. 2016) .........................................................30, 47

*Gruber v. Gilbertson,*
2019 U.S. Dist. LEXIS 159767 (S.D.N.Y. 2019) ...........................................39

*Gummo v. Village of Depew,*
75 F.3d 98 (2d Cir. 1996) ...............................................................3

*Hickory Securities Ltd. v. Republic of Argentina,*
493 Fed. Appx. 156 (2d Cir. 2012) .......................................................39

*Hyde v. United States,*
225 U.S. 347 (1912) ...............................................................9, 14, 50

iv

*In re Actos End-Payor Antitrust Litig.*,
848 F.3d 89 (2d Cir. 2017) ...................................................................31, 48

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ...........................................................................38

*In re Auction Houses Antitrust Litig.*,
193 F.R.D. 162 (S.D.N.Y. 2000) ......................................................................38

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 326 (E.D. Mich. 2001) ...................................................................28

*In re Commercial Tissue Prods.*,
183 F.R.D. 589 (N.D. Fla. 1998) ......................................................................29

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) ...............................................................................44

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
Case No. 1:13-cv-07789-LGS (S.D.N.Y. Mar. 23, 2023) .......................... 7, 19, 20, 46

*In re Foundry Resins Antitrust Litig.*,
242 F.R.D. 393 (S.D. Ohio 2007) .....................................................................28

*In re Initial Public Offering Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009) ..............................................................43

*In re Lamictal Direct Purchaser Antitrust Litig*,
957 F. 3d 184 (3d Cir. 2020) ............................................................................39

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002) .............................................................................28

*In re Nasdaq Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ......................................................................40

*In re Petrobras Securities*,
862 F.3d 250 (2d Cir. 2017) .............................................................................43

*In re Publication Paper Antitrust Litigation*,
690 F.3d 51 (2d Cir. 2012) ....................................................................30, 36, 48

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
287 F.R.D. 1 (D.D.C. 2012), *vacated in part on other grounds*,
725 F.3d 244 (D.C. Cir. 2013) ............................................................... 28, 38-39

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ...........................................................................29

*In re Urethane Antitrust Litigation*,
   768 F.3d 1245 (10th Cir. 2014) ........................................................28

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124, 135 (2d Cir. 2001) ......................................................35

*Kleen Products LLC v. International Paper Co.*,
   831 F.3d 919 (7th Cir. 2016) ............................................................40

*Kurtz v. Kimberly-Clark Corp.*,
   2019 U.S. Dist. LEXIS 185334 (E.D.N.Y. 2019) ...........................39

*Litton Sys., Inc. v. AT&T Co.*,
   700 F.2d 785 (2d Cir. 1983) .............................................................36

*Loeb Indus., Inc. v. Sumitomo*,
   306 F.3d 469 (7th Cir. 2002) ............................................................40

*Loginovskaya v. Batratchenko*,
   764 F. 3d 266 (2d Cir. 2014)............................................................42

*Mandeville Island Farms v. American Crystal Sugar*,
   334 U.S. 219 (1948) ..........................................................................10

*Minnesota Mining v. New Jersey Finishing*,
   381 U.S. 311 (1965) ..........................................................................13

*N. Pac. Ry. Co. v. United States*,
   356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958) .........................30

*Olean Wholesale Grocery Corp. v. Bumble Bee Foods*,
   No. 19-56514 (9th Cir. April 6, 2021)..............................................28

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
   281 F.3d 629 (7th Cir. 2002) ............................................................40

*Pinkerton v. United States*,
   328 U.S. 640 (1946) ..........................................................................14

*Price v. L'Oreal U.S., Inc.*,
   17 Civ. 614 (LGS) (S.D.N.Y. Aug. 15, 2018) .................................43

*Reiter v. Sonotone*,
   442 U.S. 330, 99 S. Ct. 2326 (1979)......................................17, 38, 49

*Roach v. T. L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)................................................................3

*Robert v. Dept. of Justice,*
439 F. App'x 32 (2d Cir. 2011) ........................................................3

*Smith v. United States,*
568 U.S. 106 (2013) ........................................... 9, 14, 15, 50

*Story Parchment Co. v. Patterson Paper Parchment Co.,*
282 U.S. 555 (1931) ........................................................38, 48

*Sykes v. Mel S. Harris & Assoc. LLC,*
780 F.3d 70 (2d Cir. 2015) ..............................................37

*Texas Industries, Inc. v. Radcliff Materials, Inc.,*
451 U.S. 630, 101 S. Ct. 2061, 68 L. Ed. 2d 500 (1981) ..............40

*Tyson Foods v. Bouaphakeo,*
577 U.S. 442 (2016) ........................................... 28, 38

*U.S Football League v. Nat'l Football League,*
842 F.2d 1335 (2d Cir. 1988) ..............................................36

*United States v. Aiyer,*
33 F.4th 97 (2d Cir. May 2, 2022) ...................................7, 15, 20

*United States v. American Tobacco,*
221 U.S. 106 (1969) ........................................... 3, 16

*United States v. Borden Co.,*
308 U.S. 188 (1939) ........................................... 9, 50

*United States v. CitiCorp.,*
No. 3:15-cv-78 (SRU) (D. Conn. Sep. 22, 2015) ..............33

*United States v. Gypsum Co.,*
438 U.S. 422 (1978) ........................................... 9, 50

*United States v. Kissel,*
218 U.S. 601 (1910) ........................................... 14, 15

*United States v. Socony-Vacuum Oil Co.,*
310 U.S. 150 (1940) ...................................................*passim*

*Zenith Radio v. Hazeltine Research, Inc.,*
395 U.S. 100 (1969) ........................................................36

**Statutes & Other Authorities:**

15 U.S.C. § 1 ...........................................................................................1, 4, 17

15 U.S.C. § 15 ............................................................................................ 1, 4

15 U.S.C. § 15(a) ...........................................................................................1

15 U.S.C. § 16 .................................................................................4, 8, 9, 13

15 U.S.C. § 16(a) ........................................................................................13

15 U.S.C. § 26 ................................................................................................1

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

28 U.S.C. § 1337 ...........................................................................................1

Calif. Bus. & Prof. C. § 16700 ....................................................................1

Calif. Bus. & Prof. C. § 17200 ....................................................................1

Fed. R. Civ. P. 23 ..........................................................................................4

Fed. R. Civ. P. 23(b)(3) ..............................................................................29

Fed. R. Evid. 801(d)(2) ...............................................................................25

U.C.C. Article 2 ...........................................................................................42

U.C.C. Article 4A ........................................................................................42

William B. Rubenstein, et al., Newberg and Rubenstein on Class Actions (5th ed.)....43

**Statement of Subject Matter and Appellate Jurisdiction**

This is a horizontal price-fixing conspiracy class action brought in the district court by consumers and business end-users pursuant under §§4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§15(a), 26), alleging violations of section 1 of the Sherman Antitrust Act (15 U.S.C. §1), the California Cartwright Act (Bus. and Prof. Code §§ 16700, et seq.) and the California Unfair Competition Act (Calif. Bus. & Prof. C. sec. 17200 et seq.) by Defendant competitor banks, to price-fix and manipulate the foreign currency FX spot benchmark exchange rates at which Plaintiffs and the putative class purchased foreign currency from Appellees. The District Court had subject matter jurisdiction under Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26) and Title 28, United States Code, Sections 1331 and 1337.

Appellants appeal from 1) The District Court's Order Granting Summary Judgment and Entry of Judgment against Plaintiffs (ECF 855, 856) dated March 30, 2023 ("S.J. Order"); 2) The District Court's Order Denying Class Certification ("Class Cert. Order") (ECF 776); and from The District Court's Final Order Denying Plaintiffs' Motion to Set Aside the Judgment (ECF 858) entered on April 12, 2023. Appellants filed a timely notice of appeal (ECF 859) on April 13, 2013. This court has appellate jurisdiction under 28 U.S.C. § 1291.

**Issues**:

1.       Contrary to the district court's rulings that "purchase" in the definition of appellants' class is confined to cash only and excludes purchases by credit card, wire, online transactions, ATM's and other means of purchase.

2.       Contrary to the district court's rulings prohibiting depositions, including 30(b)6 depositions, the Appellants were entitled to discovery under principles of equal protection of the law and procedural due process.

3.       Contrary to the district court's decision prohibiting the oral hearing on the disposition of summary judgment, Appellants were entitled to a hearing under the 5th Amendment that due process entitles parties to an opportunity to be heard.

4.       Contrary to assertions by the district court, the formula applying the amount of damages as .0003 times the transaction was used in the plea agreements and agreed by the Appellees as reasonable.

5.       Contrary to the District Court's ruling denying class certification, the Appellees incorporated their FX spot market prices as "base" or "baseline" prices as the essential component in the Appellees' retail prices purchased by Appellants which provided common, generalized proof of injury in fact, impact and causation.

## Standard of Review:

The standard of review of the trial Court's order and decision granting summary judgment against Appellant is *de novo*. The appellate court may give no deference to the trial court's decision and must review the facts in the light most favorable to the non-moving party and must give the non-moving part the benefit of all reasonable inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn. *See Continental Ore Co, et al. v. Union Carbide & Carbon Corp. et al*, 370 U.S. 690, at 696 (1962). *Beard v. Banks*, 548 U.S. 521 (2006); *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451 (1992); *Gummo v. Village of Depew*, 75 F.3d 98 (2d Cir. 1996). "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." Individual acts in the course of any conspiracy always occur in furtherance of the entire conspiracy and is part and parcel of the overarching conspiracy to fix and stabilize prices. Such episodes must not be separated from each other or individually viewed and scrutinized. *Id.* Even "wholly innocent" acts are part of a conspiracy when viewed as its whole. *See United States v. American Tobacco*, 221 U.S. 106 (1969).

The standard of review on a denial of class certification is one of abuse of discretion, applying a "noticeably less deferential" standard when the district court has denied class certification, reviewing the district court's construction of legal standards *de novo* and "the application of those standards for whether the district court's decisions fall within the range of permissible decisions." *Roach v. T. L. Cannon Corp.,* 778 F.3d 401, 405 (2d Cir. 2015). The standard of review for a mixed question of law and fact is *de novo. Robert v. Dept. of Justice*, 439 F. App'x 32 (2d Cir. 2011).

## Statutes and Rules

**Section 1 of Sherman Act, 15 U.S.C. § 1**:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

**Section 4 of Clayton Act, 15 U.S.C. § 15**:

. . . any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

**Section 5 of Clayton Act, 15 U.S.C. § 16**:

A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant

**Rule 23, F.R.Civ.Procedure:**

One or more members of a class may sue or be sued as representative parties on behalf of all members . . .


## Statement of the Case

Appellants allege a conspiracy among the Respondent banks to fix the prices of foreign exchange ("FX") in trading in the FX spot market in violation of Section 1 of the Sherman Act as evidenced by Respondents' Plea Agreements and regulatory

orders (Third Amended Complaint ("TAC" *Nypl* Dkt. No. 190, pled as TAC Exhibits A-1 to D-4, Dkt. Nos. 190-1 to 190-22), which FX spot market prices Appellees incorporated as "base" or "baseline" prices in the retail prices of FX they sold to Plaintiffs and the putative class of purchasers of FX. Generalized, common proof of injury-in-fact, impact and causation is shown by Respondents' guilty Plea Agreements and regulatory orders confirming that they conspired to fix and widen the "two-way" bid and ask FX spot market prices continuously, and by Respondents' June Declarations that they incorporated the manipulated FX spot market prices as the principal component in their FX retail prices. In widening the spread between bid and ask [offer] prices, Appellees increased the 'ask' price at which they were willing to sell FX to purchasers and decreased the bid price for re-purchases.

Appellees pled guilty and admitted in their Plea Agreements and other government orders that they engaged in a continuous, *per se* conspiracy to fix the spot market prices of foreign currency,[1]and in their June Declarations admitted that they incorporated the spot market prices in the retail prices of foreign currency ("FX") that Appellants and the putative class directly purchased from them. (Saba Supplemental Report Dkt. No. 725 ¶¶6-13) As the result of Respondents' guilty pleas and other

---

[1] The TAC Dkt. No. 190 with the Plea Agreements and other government orders attached as Dkt. Nos. 190-1 to 190-22 (JP Morgan Chase ("JPMC") – TAC Exhibit A-1; Citicorp ("Citi") - TAC Exhibit A-2; Barclays PLC – TAC Exhibit A-3; Royal Bank of Scotland ("RBS") – TAC Exhibit A-4; UBS AG – TAC Exhibit A-5, Ex.1 ¶¶3-15; and HSBC's Deferred Prosecution Agreement ("DPA") 2012 – TAC Exhibit A-6, plus HSBC's DPA 2018 – (Dkt. No. 425) and its CFTC Order (TAC Exhibit B-2). Bank of America's ("B of A") participation in the conspiracy to fix spot market prices is established by the Comptroller of the Currency ("OCC") Order (TAC Exhibit D-3) and the Fed Order (TAC Exhibit C-2).

government orders, the district court stated at pp.13-14 of its Order denying class certification: "The parties do not dispute that proof common to the class can be offered to show a violation of antitrust law, here a conspiracy to fix prices."

 Respondents' Plea Agreements and other government orders, pled as exhibits to the Third Amended Complaint ("TAC" Dkt. No. 190) as Exhibits A-1 to D-3 (Dkt. Nos. 190-1 to 190-22) and Respondents' June Declarations (Saba Supplemental Report Dkt. No. 725 ¶¶6-13)[2] provide generalized, common proof that Respondents' engaged in a conspiracy to fix FX spot prices and incorporate the FX spot prices in their retail prices causing injury to Plaintiffs. The district court erred in concluding that but-for generalized proof common to the class could not be offered to show injury-in-fact, causation and impact,[3] erroneously ruling that Respondents' trades in the FX spot market were "episodic" and "multidirectional," and erred in requiring proof of each transaction in an individualized day-to- day analysis, even though Respondents' day-to-day transaction data was not always available as Respondents' expert admitted. (Expert Report of Bruce A. Strombom Dkt. No. 735-1 ¶70).

The district court's conclusion that the admitted conspiracy is not susceptible to generalized proof of causation on the theory that Appellees FX spot market trades involved single price up-and-down "episodic" and "multidirectional" trades is wrong and inconsistent with the "two-way pricing" in the form of bid and offer prices for

---

[2] Respondents' June Declarations are attached to the Declaration of Andrew Ruffino Dkt. Nos.727-8 Decl. Kunyk, 727-9 Decl. Drago, 727-10 Decl. Keller, 727-11 Decl Rivet.

[3] Saba Supplemental Report ¶¶6-27 Dkt. No. 725

6

the EUR/USD currency pair referenced in Plea Agreements ¶4(e) and ¶4(g) and the widening of the spread between them described in the district court's related *Forex* Opinion, the *Forex* jury verdict, and the Second Circuit's Order in *United States v. Aiyer*, 33 F. 4th 97-109 (2d Cir. May 2, 2022).

Both the Order denying class certification (Dkt. No. 776) and the Order granting summary judgment (Dkt. No. 855) are based on the district court's clearly erroneous finding that the admitted conspiracy to fix prices is not susceptible to generalized proof of causation on the theory that the FX spot trades involved individualized single price up-and-down "episodic" and "multidirectional" trades, which is directly contrary to the district court's own description of the reality of FX spot trades as involving the widening of "two-way" bid-ask price spreads, in its *Forex* Order in the related, consolidated case of *In re Foreign Exchange Benchmark Rates Antitrust Litigation ("Forex")*, Case No. 1:13-cv-07789-LGS (S.D.N.Y. *Forex* Dkt. No. 1331),[4]

Respondents' admissions in their Plea Agreements that they fixed Spot market prices, that involve "two-way" bid/ask spreads, in the FX Spot market continuously and their admissions in their June Declarations that they incorporated the FX spot market prices in their retail prices provide generalized proof of causation that merits class certification, and present triable issues of fact that require reversal of the

---

[4] The instant case was consolidated for discovery with *In re Foreign Exchange Benchmark Rates Antitrust Litigation ("Forex")*, Case No. 1:13-cv-07789-LGS (S.D.N.Y. *Forex* Dkt. No. 1331 by Order entered 06/08/16 Dkt. No. 104 at pp. 5-7.

summary judgment.

## Summary of Argument

The Appellees' motion for Summary Judgment should be denied on the following grounds, among others: a misapprehension of the law of conspiracy, and that there are triable issues of fact for the jury. Plaintiffs assert pursuant to Section 5 of the Clayton Antitrust Act (15 USC §16) that the Plea Agreements and the admissions in the other Government Orders, attached to the Third Amended Complaint ("TAC"), are "prima facie" evidence of the conspiracy of the daily FX spot market prices on which the Appellees' retail prices are admittedly based separate, apart, and in addition to the Appellees' fixing of the WM/R and ECB. (Defendant HSBC fixed prices on WRT almost exclusively.) In addition to the prima facie effect of the Plea Agreements and the admissions, the Plaintiffs are intitled to the prima facie effect "as to all matters respecting which said judgment or decree would be an estoppel as between the parties [DOJ] thereto." See Section 5 of the Clayton Antitrust Act (15 USC §16). Furthermore, there are triable issues of fact as to whether the Appellees' Plea Agreements and agency admissions by Bank of America, HSBC and UBS are admissible to prove their participation in the conspiracy to fix prices by, among other means and methods, "withholding bids and offers," as referenced in ¶4(i) of the Plea Agreements. The other fixes described in ¶13 of the Plea Agreements and fixes of "market prices generally," as described in the Federal Reserve Orders ((TAC Exhibits C-1 to C-6 and OCC Orders (D-1 to D-3), are separate and apart from, and in addition to the Appellees' manipulating the WM/R and ECB fixes. Moreover, as noted above, pursuant to Section 5 of the Clayton Antitrust Act, the Appellees would be estopped from contesting either

pecuniary loss to the Plaintiffs regarding restitution, the affected volume asserted by the Department of Justice, and the DOJ's estimate of the amount of the overcharge using 3 "pips" (as stated in the Appellees' Answers to the Plaintiffs' Interrogatory Request No. 4), all of which the Appellees admitted in their Plea Agreements as "reasonable." Of course, pursuant to Section 5 of the Clayton Act, the Case 1:15-cv-09300-LGS Document 815 Filed 09/29/22 Page 6 of 30 2 Appellees would be estopped from denying their acceptance of the DOJ's estimate of the amount of the overcharge and its impact upon victims, which was a specific statement and topic in the Plea Agreements themselves, making these civil actions a substitute for the otherwise requirement of Restitution. In addition, there is a triable issue of fact as to whether causation is shown by the Appellees' admissions that they engaged in a conspiracy to "eliminate competition" and fix two-way bids and offers that were "continuous and uninterrupted" and "had a direct effect on trade and commerce" as admitted in ¶4(g), ¶4(i) and ¶4(j) of Appellees' Plea Agreements, separate and apart from the WM/R and ECB fixes. Finally, the Appellees' motions are defeated by matters of law which the Appellees have misapprehended - or ignored. First, it is black letter law that conspiracies are continuing "'through every moment of the [conspiracy's] existence,'" Smith v. United States, 568 U.S. 106 (2013), citing Hyde v. United States, 225 U.S. 347, 369 (1912); and "'A conspiracy thus continued is in effect renewed during each day of its continuance.'" United States v SoconyVacuum Oil Co., 310 U.S. 150 (1940), citing United States v. Borden Co., 308 U.S. 188, 202 (1939). Indeed, the only way "'[T]o avert a continuing criminality' there must be 'affirmative action…to disavow or defeat the purpose' of the conspiracy. Hyde, supra, at 369." Smith v. United States, supra; see also United States v. Gypsum Co., 438 U.S. 422 (1978). The Appellees contrary implication

that the conspiracy in this case turned "on" and "off" sometimes acting legally and sometimes acting illegally is directly contrary to the well-established law. Even the Appellees knew it since they referred to themselves as a "Cartel" and the "Mafia." Neither Cartels nor the Mafia sleep. Second, as noted above, it is well established that in an antitrust conspiracy, or for that matter in any conspiracy, the Appellees are jointly and severally liable. The contrary implication by the Appellees in this case is contrary to law. Case 1:15-cv-09300-LGS Document 815 Filed 09/29/22 Page 7 of 30 3 Third, under antitrust laws, and as admitted in the Plea Agreements, the Appellees not only fixed the purchase price of euros but they also fixed the selling price of euros. It has long been established that a conspiracy to purchase commodities or service is a per se offense. See Mandeville Island Farms v. American Crystal Sugar, 334 U.S. 219 (1948).

Thus, in this case, and although the Plaintiffs specifically referred to the purchasing of euros, they would equally have been damaged by the sale of euros. As the Sentencing judge noted the Appellees have "rigged" the entire market. End users would pay more for buying euros and would receive less for selling euros. Contrary to any assertion by the Appellees that there was any benefit whatsoever to end user is contradicted by the undisputed fact that the Appellees fixed both the selling and buying price, and the Appellees would be estopped if they denied their admission.

### Factual and Procedural History

Plaintiffs filed their Complaint on May 21, 2015 on behalf of themselves and all consumers and businesses who purchased foreign currency (Euros) in exchange for Dollars for their own end use. The operative Third Amended Complaint was filed on August 10, 2017. The Appellees are major banks in the United States who pled guilty

in open court or otherwise confessed to regulatory agencies to a massive price-fixing agreement in the purchase and sale of foreign currency in the FX Spot Market from December 2007 to January 2013. The Appellees, who referred to themselves as "The Cartel" and "The Mafia," conspired "to fix, stabilize, maintain, increase or decrease the price of, and rig the bids and offers for, the Euro/US dollar ("EUR/USD") currency pair" and agreed "to eliminate competition in the purchase and sale of the EUR/USD currency pair in the United States." The EUR/USD is the most traded currency pair by volume, which can exceed $500 billion per day ($500,000,000,0000). The Appellees are charged with contracting, combining and conspiring in a continuous Case 1:15-cv-09300-LGS Document 815 Filed 09/29/22 Page 8 of 30 4 conspiracy to buy and sell prices of dollars and euros. Five of the Appellees admitted their misconduct and filed guilty pleas on May 19, 2015, and judgments were entered against them on January 5, 2017. At that time, the Sentencing Judge, the Honorable Stefan R. Underhill, USDC, District of Connecticut, stated the seriousness and significance of the case in no uncertain terms:

> "These crimes are quite serious. The significance stems not only from the dollar amounts involved, which are eye-popping, frankly, but also from the impact on the faith that market participants can have in the market itself. If the market is rigged, then folks who play by the rules are suckers, and the loss of faith in the accuracy and fairness, fundamental fairness of the market, is, I think, a significant aspect that makes these crimes even more significant than the dollar amounts involved.

> "That said, these fines, especially with other fines and sanctions [1] that have been imposed on the banks are also eye-popping. These are huge dollar amounts.

I think they are appropriate in light of the calculated losses the government has submitted." TAC Exhibit E-3 at 27:20-29:4). (ECF 190-26), (ECF 6, 2d. Cir.).

"I do need…to comment on the question of restitution, which has been raised [by the appellants] as an objection to acceptance. It is always best, when realistically possible, to impose restitution as part of a criminal sentencing…. This is, in my view, a very clear and obvious case in which restitution is best left to the civil process, civil litigation process, …." *Id.* at 30:10-22.

Three of the Appellees did not plead guilty, yet they were accused by other government agencies that they knowingly participated in the same conspiracy and were fined for their misconduct. The fines assessed against all the Appellees, based on the "pecuniary loss caused to the victims of the crime by the conspirators" are listed in the chart below.

| Fines imposed by UK, US, and Swiss authorities in Forex Scandal (US$ millions)[17] hide | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Bank | CFTC[18] | DFS | DOJ[19] | FCA[20] | Fed[21] | FINMA[22] | OCC[23] | Total |
| BofA | | | | | 205 | | 250 | **455** |
| Barclays[24][25][26] | 400 | 635 | 650 | 441 | 342 | | | **2,468** |
| Citibank | 310 | | 925 | 358 | 342 | | 350 | **2,285** |

| Fines imposed by UK, US, and Swiss authorities in Forex Scandal (US$ millions)[17] hide | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Bank | CFTC[18] | DFS | DOJ[19] | FCA[20] | Fed[21] | FINMA[22] | OCC[23] | Total |
| HSBC | 275 | | | 343 | | | | **618** |
| JPMorgan | 310 | | 550 | 352 | 342 | | 350 | **1,904** |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **RBS** | 290 | | 395 | 344 | 274 | | | **1,303** |
| **UBS** | 290 | | | 371 | 342 | 145 | | **1,148** |
| **Total** | **1,875** | **635** | **2,520** | **2,209** | **1,847** | **145** | **950** | **10,181** |

By its terms, Section 5(a) of the Clayton Antitrust Act (15 USC §16(a)) makes a prior final judgment or decree in favor of the United States available in later private suits to as "prima facie evidence" of "all matters respecting which" the judgment "would be an estoppel" between the Appellees and the United States. 15 U.S.C. §16; see also *Minnesota Mining v. New Jersey Finishing*, 381 U.S. 311 (1965). Section 5 provides in part that "A final judgment or decree rendered in any criminal prosecution or in any suit or proceeding in equity brought by on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any suit or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgement or decree would be an estoppel as between the parties thereto…" (Emphasis added). 15 U.S.C. §16. Pursuant to Section 5, the Appellees' plea agreements and regulatory admissions are prima facie evidence against the Appellees not only of their violation of the law itself, but also of any and all facts and inferences from which the government could claim estoppel by reason of their admissions in the plea agreements, including the price-fixing conspiracy's causation and damages calculation to the estimate of the overcharge by the Department of Justice of .0003 pips, which was used by the government and attested to by the government and the Appellees Case 1:15-cv-09300-LGS Document 815 Filed 09/29/22 Page 10 of 30 6 as reasonable. See, *Emich Motors Corporation, et av. General Motors Corporation et al.*, 340 U.S. 558 (1951). As noted in Smith

v. United States, the decision written by Justice Scalia, the Court states as follows: "…Since conspiracy is a continuing offense, *United States v. Kissel*, 208 U.S. 601, 610 (1910), a defendant who has joined a conspiracy continues to violate the law "through every moment of [the conspiracy's] existence," *Hyde v. United States*, 225 U.S. 347, 369 (1912), and he becomes responsible for the acts of his co-conspirators in pursuit of the common plot, *Pinkerton v. United States*, 328 U.S. 640, 646 (1946).

Similarly in antitrust cases, conspiracies to fix the prices continue each day of the conspiracy. As the Supreme Court noted in *United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150 (1940), conspiracies are "in effect renewed during each day of its continuance," *Socony*, supra, at 227, until proof of withdrawal which must be proved by the Appellees. Based upon the Plea Agreements and the admissions by the Appellees in regulatory proceedings, the Appellees' conspiracy, like all conspiracies, was continuing throughout the time period and as noted by the Supreme Court, conspiracies are renewed each day and continuing in nature and not subject to episodes conferring benefits on the people that deal with the conspiracy. See *Smith*, *supra*.

The foundation of the district court's decision is based upon a misreading of the plea agreements. When the Court denied Plaintiffs' Motion for Class Certification, the Court based it upon the theory that the conspiracy was not continuous throughout the time period. The Court based that decision on what the Plaintiffs respectfully submit was based on the misapprehension of the Plea agreements and said as follows:

> "The conduct Plaintiffs allege was multi-directional and episodic. There is no evidence that manipulative conduct occurred every day during the class period. Even the plea agreements appended to the complaint describe the collusive conduct as 'near daily.'"

The Appellees, knowing that the Court misapprehended the Plea Agreements, nevertheless made their arguments on the basis of the Court's misreading. Case 1:15-cv-09300-LGS Document 815 Filed 09/29/22 Page 11 of 30. Plaintiffs respectfully submit that this Court misread the Plea Agreements as to the continuation, purpose, and effect of the conspiracy; and, consequently, in the opinion of the Plaintiffs, ignored, overlooked, and misapprehended controlling and material points of both fact and law when it ruled that the conspiracy was not continuing. The basis for this erroneous holding appears to be the District Court's misreading of the Plea Agreements' references to "near daily conversations" by the Appellees in furtherance of the conspiracy. The District Court read it as "near daily conspiracy," implying that there were some days in which the conspiracy was not in effect. Even if the District Court's misreading were correct, it would still be contrary to well established law "since conspiracy is a continuing offense." *United States v. Kissel*, 218 U.S. 601, 610 (1910), cited in *Smith v. United States*, 568 U.S. 106 (2013). Neither the plea agreements nor regulatory judgments indicate that the conspiracy was not continuing. Notwithstanding, conspiracies as a matter of law are continuing until there is a disavowal by the conspirators and an affirmative action to defeat the purpose of the conspiracy. Consequently, the decision by the District Court is directly contrary to the Supreme Court and the admissions of the Appellees' guilt, including their admissions in referring to themselves as "The Cartel" and "The Mafia." Appellees' conspiracy to fix prices and rig bids in the FX spot market by eliminating competition, as admitted in the Plea Agreements, constitutes an over-arching conspiracy as a matter of law, not to be viewed as a series of individual acts or episodes, contrary to the Appellees' expert's theory. *United States v. Aiyer*, 33 F.4th 97 at 109 (2022), *Continental Ore Co. v. Union Carbide Corp.*,

370 U.S. 690, 699 (1962), ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."). Individual acts in the course of any conspiracy always occur in furtherance of the entire conspiracy and is part and parcel of the overarching conspiracy to fix and stabilize prices. See *Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690 (1962). The District Court's decision about "episodic" and "multidirectional" manipulations is nothing more than to state various overt acts in furtherance of the conspiracy, which does not excuse any acts the continuance of the conspiracy. Even "wholly innocent" acts are part of a conspiracy when viewed as its whole. See *United States v. American Tobacco*, 221 U.S. 106 (1969). Appellees cannot and do not contest the fact of violation of law by all of them, nor can they contest the fact of measure of overcharge inflicted on purchasers, but they do attempt to suggest that there is no connection between Plaintiffs' injury and Appellees' violations. However, the fact of injury is proven each time Plaintiffs purchased and re-sold euros and dollars, whether they were buying or selling them. Plaintiffs were injured since they bought and sold into the fixed market, and at no time did they profit from any of the transactions in this fixed capsule of buying and selling euros. Furthermore, under the Plea Agreements, the Appellees agreed that restitution of what they took from innocent victims would be determined in private lawsuits. Notwithstanding this commitment, and thereby jeopardizing their Plea Agreements by fraud, they sought to trivialize the case. From the very beginning of the case, the Appellees misled the Court and unfortunately, the Court adopted as true what the Appellees said. This effort to trivialize the Plaintiffs' case was repeated in various forms. As a result, for example, the District Court artificially and substantially limited the scope of Plaintiffs' alleged class action by including the word "physical"

purchases, which by that fact, ipso facto, eliminated purchases by credit cards, wire debit card, online and other means and methods of purchases, thus stripping the simple meaning of "purchase" of its common usage and understanding, namely, to buy with money or money's equivalent. See *Reiter v. Sonotone*, 442 US 330, at 339 (1979). The District Court did so on no greater authority than the false statements by the Appellees, "the four complaints plaintiffs have filed since 2015 have all asserted claims based on purchases of "physical" foreign currency…" The word "physical" simply does not exist in the complaints. As a result, the Appellees achieved a 99% windfall of billions of dollars stolen from victims by reason of the Appellees' intentional conduct in contradiction to the promises made in their Plea Agreements. There is nothing trivial about this case or the damage it has caused to not only the Plaintiffs, but the market itself. The Appellees' motion for summary judgment should have been denied both as a matter of law and as a matter of fact; it is contrary to controlling law and, if granted, will result in the largest windfall for the convicted financial criminals.

## Argument

### I.  Appellees' Conspiracy To Fix The Two-Way FX Spot Prices By Widening The Spread Between Bid And Offer Is Susceptible To Generalized Proof Of Causation That Merits Class Certification

Appellees admitted in ¶4(g) of their Plea Agreements that they pursued their common conspiracy to fix FX exchange rates "by agreeing to eliminate competition in the purchase and sale of the EUR/USD currency pair in the United States and elsewhere" in violation of section 1 of the Sherman Antitrust Act 15 U.S.C. sec. 1, together with Appellees' admissions in their June Declarations that they incorporated

the FX spot market prices in their FX retail prices constitute predominant generalized, common class-wide proof of causation that merits class certification.[5]

**A. The District Court's Finding Of "Episodic" And "Multi-Directional" Single Price Up-And Down FX Trades Is Clear Error And Inconsistent With Its Own Description Of Two-Way Bid-Ask Spreads In Its Related *Forex* Order And Inconsistent With The *Forex* Jury Verdict And The Plea Agreements**

In its Order denying class certification at p.14, the district court erroneously stated (SPA-1):

"The nature of the alleged conspiracy in this case is the reason that common proof will not suffice. This case involves alleged intermittent, up-and-down manipulation of foreign exchange rates resulting in a proposed class of retail purchasers, each of whom may have been benefitted, harmed or unaffected by the alleged manipulated prices. That is what is meant by describing the conspiracy as "episodic" and "multi-directional.""

Because it adopted the fictitious theory that FX spot trades involved single price up-and-down "episodic" and "multi-directional" trades, the district court erroneously found that Appellees' conspiracy to fix prices did not cause injury susceptible to generalized common proof. But this "episodic" and "multi-directional" theory is directly contrary to the district court's own description of the reality of FX

_____

[5] Each of the Plea Agreements TAC Exhibits A-1 to A-4 generally contain the same language.

spot trades as involving "two-way" bid-ask price spreads that traders sought to widen, in its *Forex* Order in the related, consolidated case of *In re Foreign Exchange Benchmark Rates Antitrust Litigation ("Forex")*, Case No. 1:13-cv-07789-LGS (S.D.N.Y. *Forex* Dkt. No. 1331)[6], which states at page 2:

"A liquidity provider will quote 'two-way prices' – a 'bid' price (the price at which a dealer is willing to purchase a currency) and an 'ask' price (the price at which the dealer is willing to sell a currency). The difference between the bid price and ask price is known as the 'bid-ask spread' or 'spread.' A 'half-spread' (i.e., one-half of the spread) represents the effective 'price' a customer would pay either to buy from or sell to a liquidity provider. Liquidity providers generally want wider spreads, which allow them to buy lower and/or sell higher, thus increasing profits." (Quoted verbatim in the Declaration of Carl Saba In Rebuttal To March 4, 2021 Report of Bruce A. Strombom (CJA 1510, Dkt. 816-13 ¶9).

Appellants' expert Saba in his Declaration of Carl S. Saba In Rebuttal To March 4, 2021 Report Of Bruce A. Strombom stated (CJA 1510 at ¶10): "The conspiracy affected the FX Spot Market spread in two ways. First, Defendants fixed the offer (also known as the ask price) on the EUR/USD currency pair. To be economically beneficial to Defendants, the ask price is fixed by *increasing* it, i.e., by offering to charge a higher price in US Dollars to sell customers Euros. As a result, the customer is damaged by paying an overcharge and receiving fewer Euros in

exchange for its US Dollars. Dr. Strombom's "multi-directional" understanding of the conspiracy theory is nonsensical because it is contrary to the two-way pricing described by this Court in its *Forex* Order at p. 2 and par.4(e) of the Plea Agreements, and it would result in Defendants having conspired to their own detriment by charging fewer US Dollars for Euros they were selling to their customers."

Thus, Plaintiffs' claims are based on the overcharges resulting from Appellees' admitted conspiracy to fix prices by widening the two-way bid-ask spread by increasing the ask or offer prices to "sell higher," and does not involve single price up-and-down "episodic" and "multidirectional" price gyrations that Defendants' expert Strombom urged on the district court and the court erroneously adopted.

Further, the conspiracy to widen two-way bid-ask spreads was tried to a jury in the related *Forex* case and the jury returned a special verdict that the conspiracy was to widen, fix, stabilize or maintain bid-ask spreads in the FX spot market as follows:

**"Question 1:**      **Did Plaintiffs prove, by a preponderance of the evidence, the existence of a conspiracy to widen, fix, stabilize or      maintain bid-ask spreads in the FX spot market ?**

**A:**            **Yes."** (Plaintiffs' Sur-reply JA-2654, Dkt. No. 834), attaching the *Forex* Jury Verdict in *In re Foreign Exchange Benchmark Rates Antitrust Litigation ("Forex")*, Case No. 1:13-cv-07789-LGS (S.D.N.Y.) (*Forex* Dkt.No. 1997, 1998-7). (Emphasis supplied).

In *United States v. Aiyer*, 33 F. 4th 97, 106 (2d Cir. May 2, 2022), the Second Circuit described "two-way" bid-ask pricing in the FX spot market as follows:

"In this context potential customers are provided with a "two-way" price quote (or "spread")—the "bid," i.e., the price at which the dealer bank would be willing to buy a particular currency, and the "offer" or "ask," i.e., the price at which the dealer bank would be willing to sell a particular currency."

Thus, the *Forex* jury verdict and the district court's *Forex* Order and the Second Circuit's *Aiyer* Order all contain consistent descriptions of "two-way" bid/ask spread pricing in the FX spot market that corroborate Appellees' admissions in ¶4(e) of the Plea Agreements, pled as Exhibits A-1 to A-4 of the TAC (JA 130-JA 249), that states:

"A dealer in the FX Spot Market quotes prices at which the dealer stands ready to buy or sell the currency. These price quotes are expressed as units of a given currency, known as the 'counter currency,' which would be required to purchase one unit of a 'base currency,' which is often the U.S. dollar and so reflects an 'exchange rate' between the currencies… A dealer may provide price quotes to potential customers in the form of a "bid/ask spread," which represents the difference between the price at which the dealer is willing to buy the currency from the customer (the "bid") and the price at which the dealer is willing to sell the currency to the customer (the "ask") [or offer].

Likewise, in ¶4(g) of the Plea Agreements incorporated in the TAC, Appellee banks admitted that they conspired to fix **bids and offers** in the EUR/USD **currency pair** as follows:

"During the Relevant Period, the defendant and its corporate co-conspirators, which were also financial services firms acting as dealers in the FX Spot

Market, entered into and **engaged in a conspiracy** to fix, stabilize, maintain, increase or decrease the price of, and **rig bids and offers** for, the EUR/USD **currency pair** exchanged in the FX Spot Market *by* **agreeing to eliminate competition** in the purchase and sale of the EUR/USD **currency pair** in the United States and elsewhere." (Emphasis added). (JA 190-JA 249, Dkt. #190 Exs. A-1 to A-4).

The district court's *Forex* Order, the *Forex* jury verdict, the Second Circuit's *Aiyer* Order, and Plea Agreements ¶4(e) and ¶4(g), incorporated in the TAC, consistently find "two-way pricing" in the form of bid and offer prices for the EUR/USD currency pair in the FX spot market, for which Appellees conspired to widen the spread between "*bids and offers,*" by *increasing the ask or offer price* and decreasing the bid price to sell higher and buy lower.

Contrary to the district court's erroneous single price up-and-down "episodic" and "multidirectional" theory, as to which the district court erred in stating: "The plea agreements state that the traders attempted to move benchmarks sometimes upward and sometimes downward, And the TAC alleges a 'conspiracy to 'increase or decrease prices.'" (Class Cert. Order SPA-1 at p.16). But the words upward and downward do not appear in the Plea Agreements.

And as Saba stated: "To widen the spread, in a way that is beneficial to Defendants, is to (a) decrease the bid price at which Defendants purchased the Euro and/or to (b) *increase the ask [or offer] price at which Defendants sold the Euro.*" (Declaration

of Carl S. Saba In Rebuttal To March 4, 2021 Report of Bruce A. Strombom, (CJA 1510, Dkt. 816-13 ¶12.). (Emphasis supplied).

Plaintiffs' expert, Carl Saba in the Declaration of Carl Saba In Rebuttal To March 4, 2021 Report of Bruce A. Strombom (CJA 1510 Dkt. 816-13 ¶¶9-22) rejected Strombom's "episodic" and "multidirectional" theories at ¶14 as "wrongly based on a single spot market price that moves up and down, contrary to the two-way bid and offer spread prices that conspirators manipulated in opposite directions to widen the spread between the bids and offers, described in this Court's *Forex* Order at p. 2, and the Plea Agreements at ¶4(e)," and further corroborated by the *Forex* jury verdict and the Second Circuit's *Aiyer* Order as well as ¶5 of Appellees' Rivet declaration and ¶5 of its Kunyk declaration, in the June Declarations, both of which reference "bid and ask prices."

The district court erred in denying Appellants the opportunity to depose the individuals who entered the guilty pleas and the individuals who signed the Plea Agreements for Appellees. (Dkt. 623, Dkt. 666). In fact, the district court only allowed Appellants to take two fact depositions with the *Forex* plaintiffs – the deposition of Mathew Gardener an FX spot market trader with Citibank, Barclays and UBS who testified: ███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ (Deposition of Gardener 24:18-23, 240:4-242:4, CJA 1445, Dkt. No. 720-10) and Joseph Landes, a

trader with Bank of America, who took the Fifth Amendment throughout and the deposition of Terry Keller, a June Declaration declarant.

## B. In their June Declarations, Appellees Admitted Direct Common Causation In That They Admitted Incorporating The Price-Fixed FX Spot Market Prices As Base or Baseline Prices And The Principal Component In Their FX Retail Prices

Appellees' expert Prof. Strombom testified that Appellees used the daily spot market rate "to set the **base** [retail] rate to which a premium or markup was added." (Deposition of Bruce A. Strombom 88:2-89:8, CJA 1432, Dkt. No.720-9). ███████████

███████████████████████ (Saba Supplemental Report CJA 348, Dkt. No.725 ¶¶9-23), the manipulated FX spot market exchange rates were the principal component of Defendants' FX retail rates. In concurrence, Defendants' expert Strombom testified:

████████████████████████████████████████████

████████████████████████████████████████

████████████ (Deposition of Bruce A. Strombom 88:2-89:8, CJA 1432, Dkt. No.740-2). Accord: Declaration of Carl Saba In Rebuttal To March 4, 2021 Report of Bruce A. Strombom (CJA 1510, Dkt. 816-13 ¶8).

The Defendants filed their June, 2020 Declarations (Decl. Kunyk CJA 1411, Dkt. No.727-8; Decl. Drago CJA 1416, Dkt. No. 727-9; Decl. Keller CJA 1394, Dkt.

No. 727-10; Decl. Rivet CJA 1390, Dkt. No.727-11 the "June Declarations")[7] as their

Responses to Plaintiffs' First Set of Interrogatories, Interrogatory 8A, which asked:

"How did you a Defendant bank, determine the USD/EUR FX Exchange rate

for purchase of EUR with USD for wire to another location in the period January 1,

2007 to January 2013. (A.) Was it based on a formula? (B.) Was it based on the spot

rate as of a certain day, plus mark-up?"

In response, Appellees served the following declarations on Appellants in June,

2020 (the "June Declarations"), referenced in Saba Supplemental Report CJA 348,

Dkt. No. 725 ¶¶6-13):

(1) Declaration of Jo-Ann E. Rivet for Respondent Bank of America, ¶5 of which

states:

███████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████ (CJA 1390, Dkt.

No. 727-11)

(2) Declaration of Terry Keller at Travelex Currency Services, Inc. ("Travelex"),

agent for Respondent Citibank, ¶10 of which states:

███████████████████████████████████████████

███████████████████████████████

[7] Appellees' June Declarations are admissible as admissions by party-opponents pursuant to the Federal Rules of Evidence, Rule 801(d)(2).

In his deposition, Keller testified:

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ .

████████

█████████████████████████████████████

██████████████████████████████████████

███████████████████████████

(3)  Declaration of Bohdan Kunyk at Bank of America, N.A., ¶5 of which states:

█████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

█████████████

(4) Declaration of David C. Drago at JP Morgan Chase Bank, N.A., ¶7 of which

states:

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

(5) Declaration of Terry Keller of Travelex, which was also agent for Defendant

HSBC, ¶15 of which states:

Thus, Appellees' Plea Agreements admitting continuously price-fixing the FX

spot market prices and their own June Declarations admitting, as "*uncontested*,"[8] that

they incorporated the FX spot market prices as the "base" or "baseline" and principal

component of their FX retail prices, provides generalized proof of injury-in-fact for

purposes of class certification and reversal of summary judgment.

## C. The June Declarations And Saba's Expert Supplemental Report Show That Injury-in-Fact Is Susceptible To The Common Proof That Appellees Incorporated The Price-Fixed FX Spot Market Rates As Base or Baseline Prices And The Primary Component In Their FX Retail Rates

Appellees' above June Declarations describe the daily FX spot market prices

that Appellees incorporated in their retail prices as "base" and "baseline" prices. Such

Price-fixing affects all market participants, creating an inference of class-wide impact

_____

[8] In its Class Cert. Order SPA-1, Dkt. No. 776, the district court stated at page 5 lines 8-10: "Defendants argue Saba's regression analysis should be excluded because (i) they simply confirm *uncontested facts*, specifically that Defendants used early morning FX spot market rates to calculate retail rates…"

that overrides individualized issues where, as here, the evidence shows that the price-fixed FX spot market prices were incorporated *as baseline prices* in Appellees' retail prices. In *Olean Wholesale Grocery Corp. v. Bumble Bee Foods*, No. 19-56514 at 27 (9th Cir. April 6, 2021), the court ruled that even assuming individualized differences, "a higher list price as a result of Defendants' price-fixing scheme could have raised the baseline price…and affected the range of prices…and allow the 'reasonable inference of class-wide liability.' *See Tyson Foods*, [*v. Bouaphakeo*, 577 U.S. 442, (2016)], 136 S. Ct. at 1045 (citations omitted)." In *In re Urethane Antitrust Litigation*, 768 F.3d 1245, 1254 (l0th Cir. 2014), the court held that the price-fixing of a base or baseline, such as the FX spot market prices, creates an inference of class-wide impact or causation that is predominant: "The district court did not abuse its discretion in determining that impact involved a common question that would override other individualized issues. Under the prevailing view, price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated. *E.g., In re Linerboard Antitrust Litig.,* 305 F.3d 145, 151-52 (3d Cir.2002); *In re Foundry Resins Antitrust Litig.,* 242 F.R.D. 393, 409-10 (S.D.Ohio 2007).[7] The inference of class-wide impact is especially strong where, as here, there is evidence that the conspiracy artificially inflated the baseline for price negotiations. *See In re Rail Freight Fuel Surcharge Antitrust Litig.,* 287 F.R.D. 1, 61 (D.D.C.2012) (holding that common proof could be used to prove injury by raising the starting point for negotiations), *vacated in part on other grounds,* 725 F.3d 244 (D.C.Cir.2013); *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 345-47 (E.D.Mich.2001) (holding that injury was provable through class-wide

evidence involving inflation of the baseline for individual negotiations); *In re Commercial Tissue Prods.,* 183 F.R.D. 589, 595 (N.D.Fla. 1998) (holding that impact of price-fixing was provable through class-wide evidence, notwithstanding individualized negotiations for every distributor); *see also In re Scrap Metal Antitrust Litig.,* <u>527 F.3d 517</u>, 535 (6th Cir.2008) ('[E]ven where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure."

Appellees' admissions of their conspiracy to fix prices and rig bids and offers in the FX spot market by "agreeing to eliminate competition," as admitted in ¶4(g) of the Plea Agreements, constitutes a single over-arching conspiracy that corrupted the entirety of the FX spot market by interfering with the free play of market forces. In *United States v. Socony-Vacuum*, 310 U.S. 150, at 213 (1940) the Supreme Court held that because the elimination of competition in price-fixing agreements creates "the potential power to destroy or drastically impair the competitive system," they are unreasonable per se, "*without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day* whether it has become unreasonable through the mere variation of economic conditions…Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices, they would be interfering with the free play

of market forces." [9] *United States v. Socony-Vacuum*, 310 U.S. 150, at 221-223. (1940). (Emphasis supplied).

*Socony-Vacuum* holds a price-fixing agreement unreasonable because it corrupts the entirety of the FX spot market by interfering with the free play of market forces, without any piecemeal requirement for day-to-day, minute inquiry as to prices. Appellees' price-fixing agreement and elimination of competition is "so likely to result in artificially higher prices," that the price-fixing agreement itself constitutes strong evidence that the agreement caused at least some element of the subsequent price increases. In *In re Publication Paper Antitrust Litigation*, 690 F.3d 51, 66-67 (2d Cir. 2012, the court stated: "Price-fixing agreements are 'conclusively presumed to be unreasonable and therefore illegal' precisely because of their 'pernicious effect on competition' and lack of any redeeming virtue, *N. Pac. Ry.Co. v. United States*, 356 U.S. 1, 5, 78 S. Ct. 514, 2 L.Ed.2d 545 (1958) – i.e., because such agreements are so likely to result in artificially higher prices being charged to consumers without accomplishing any legitimate business purpose. Therefore, the demonstrable existence of [such]… an agreement constitutes strong evidence that the alleged agreement caused at least some element of the subsequent price increases (e.g., amount or effective date), or, at a minimum, the inability of plaintiffs to negotiate below the list

_____

[9] *Socony-Vacuum* is re-affirmed in *Gelboim v. Bank Am. Corp.,* 823 F.3d 759, 774 (2d. Cir. 2016).

price."[10] In *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 101 (2d Cir. 2017), the court held: "Indeed, even at summary judgment, an antitrust plaintiff may be entitled to a presumption of causation where the anticompetitive conduct 'is deemed wrongful because it is believed significantly to increase the risk of a particular injury' and that injury occurred." Appellees' admissions of price-fixing and elimination of competition gives rise to strong evidence and a presumption of causation, which coupled with the fact that Appellees lacked adequate day-to-day records as admitted by Appellees' expert (Expert Report of Bruce A. Strombom CJA 993, ¶70 at page 34, Dkt.735-1), made it error for the district court to require a piecemeal, day-to-day analysis, tracing manipulative conduct to transactions.

The June Declarations and the Saba Supplemental Report show that causation is susceptible to generalized common proof that Appellees incorporated the price-fixed FX spot market rates as the baseline and the primary component in computing their FX retail exchange rates in the relevant period. As the Saba Supplemental Report shows, and Appellees' expert acknowledged, the FX spot market rates that Defendants pled guilty to price-fixing were the baseline and the primary component of the Defendants' end-user rates. (Deposition of Bruce A. Strombom, 88:2-89:8, CJA 1432, Dkt. No.720-9), which provides generalized class-wide proof that the daily FX spot market exchange rates, that Appellees price-fixed and manipulated, directly

---

[10] Plaintiff Valarie Jolly testified as to her inability to negotiate below defendant JP Morgan Chase & Co.'s exchange rate for euros. (Deposition of Valarie Jolly CJA 38, Dkt. No. 720-1, 77:3-7.). (Emphasis supplied).

caused, injury-in-fact or impact on the retail prices paid by end-users to Appellees in the relevant 2007-2013 period. (Saba Supplemental Report CJA-348, Dkt. No. 725 ¶¶13-26).

Defendants' admissions in their June Declarations that they calculated the retail exchange rates for end-user purchasers of foreign currency by incorporating the FX spot market exchange rates they pled guilty to price-fixing as the baseline and primary component for their FX retail rates provides generalized common proof of direct injury-in-fact, impact or causation, which is augmented by the presumption of causation from Appellees' price-fixing and Saba's Report ("Therefore, any manipulation of the FX Spot Market price by Defendants directly impacted End-user prices paid by End-user class members." (Saba Supplemental Report ¶13 CJA-348, Dkt. No. 725 ¶¶6-13).

Plaintiffs' expert Saba has presented a single but-for common formula for estimating aggregate damages for the putative class as follows:

¶24 "I have reviewed Defendants' Responses And Objections To Plaintiffs' Fourth Set Of Interrogatories served on July 27, 2020 by Barclays, Citibank, JPMC, RBS and UBS. Defendants' Responses including Appendices set forth a common methodology for calculating the loss to victims, including market share and overcharges, utilized by the Department of Justice as a basis for assessing fines imposed on Defendants."

¶25 "The common formula for calculating damages is **the retail exchange rate overcharge in the sale of foreign currency by Defendants to End-users times the volume of affected retail commerce.**"

¶26"The first variable in the common formula, *the retail exchange rate overcharge* but-for Defendants' conspiracy to manipulate the FX Spot Market Rate, will be either 0.0003 (three percentage points or 'pips'), as determined by the U.S. Department of Justice[11] or my estimate of the effect of the conspiracy on the spread of the EUR/USD exchange rate in the FX Spot Market during the conspiracy period (2007-2013), with an apportionment of this spread between purchase and sale transactions (bid and offer transactions for EUR/USD). This impact on the spread can be estimated using several methods, including but not limited to comparing spreads for the FX Spot Market bid and offer prices during the conspiracy period (2007-2013) to the spreads before and after the conspiracy period, and analysis of the change in FX Spot Market spread in the period immediately following the conspiracy period, i.e.,

---

[11] The retail exchange rate overcharge but-for Defendants' conspiracy to manipulate the FX Spot Market Rate is three pips (0.0003) as determined by the Department of Justice (Saba Report ¶26) in calculating the Recommended Sentence fines contained in the Plea Agreements to which Defendants agreed: "that the Recommended Sentence set forth in this Plea Agreement is reasonable." (Plea Agreements ¶9 for JPMC, Citi, RBS, ¶12 for Barclays). The Plea Agreements ¶4(e) explain that a "pip" means "percentage in point" or the fourth decimal point in a price quote and that the spread is the difference between bid and ask prices. *See* United States Sentencing Memorandum United States Sentencing Memorandum And Motion For Departure, filed in *United States v. Citicorp.,* 15-cr-78 calculating losses based on **3 pips**. (CJA 963, Dkt. No. 727-15 at pp. 4-7)

when the manipulation ceased." (Saba Supplemental Report CJA-348 ¶¶24-26, Dkt. No. 725).

Because the Appellees colluded to widen the spread by increasing the offer prices and decreasing the bid prices on the spot market, there is no opportunity for Plaintiffs to obtain any offsetting benefits against their damages. Not only do Plaintiffs pay more to purchase Euros based on the increased spot market *ask [or offer]* prices, but in any subsequent re-sales of their Euros, they would receive lower prices on re-sale to the banks because Defendants would re-purchase the foreign currency from them at the decreased spot market *bid* prices. Thus, there is no offsetting or netting benefit due to the conspiracy. Plaintiffs pay more to buy Euros and get less on resale of Euros. (Declaration of Carl Saba In Rebuttal To March 4, 2021 Report of Bruce A. Strombom (CJA 1510, Dkt. 816-13 ¶¶14-22). It was error for the district court to call for "netting and offsetting redemptions" for benefits that do not exist. (Class Cert. Order SPA-1 at p.7 line 1).

Plaintiffs' expert Saba provides for "an apportionment of the spread between purchase and sale transactions (bid and offer transactions for EUR/USD)" since Plaintiffs' claims relate only to Plaintiffs' *purchases* of FX from Defendant banks that incorporate the collusively increased ask or offer prices[12] on the spot market into the

---

[12] Plaintiffs' claims are for the overcharge resulting from the increase in the ask (or offer) price, a 'half-spread' (i.e. one-half of the spread), "which represents the effective 'price' a customer would pay… to buy from… a liquidity provider" as described in the district court's *Forex* Order at p. 2. (Declaration of Carl Saba In Rebuttal To March 4, 2021 Report of Bruce A. Strombom CJA 1510 ¶¶10-13).

retail prices (Supplemental Report of Carl S. Saba In Support of Motion For Class Certification ¶¶26, 6-27, CJA 348, Dkt. No. 725).

With respect to injury-in-fact, impact and causation, the court in *Cordes & Co. Fin. Services v. A.G. Edwards & Sons,* 502 F.3d 91,106-107 (2d Cir. 2007), stated: "If the plaintiffs' single formula can be employed to make a valid comparison between the but-for fee and the actual fee paid, then it seems to us that the injury-in-fact question is common to the class. Otherwise, it poses individual ones…The predominance requirement is met if the plaintiff can 'establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole…predominate over those that are subject only to individualized proof.' *Visa Check*, 280 F.3d at 136…It is a test readily met in certain cases alleging…violations of the antitrust laws. *Amchem [Prods., Inc. v. Windsor]* 521 U.S. [591] at 625, 117 S.Ct. 2231." *Cordes*, 502 F.3d at 107-108. Thus, Plaintiffs' expert's single formula set forth in the Saba Supplemental Report CJA-348 at ¶¶24-27, based on Respondent banks' incorporation of the daily FX spot market exchange rate as the baseline and primary component in the FX retail rate presents common generalized class-wide proof of injury-in-fact, impact or causation, and the predominance requirement is satisfied in support of class certification. *Cordes,* 502 F.3d 91,106-107.

In *Cordes & Co. Fin. Services v. A.G. Edwards & Sons*, 502 F.3d 91,106-107 (2d Cir. 2007), the court further stated ("…we think that the legal question raised by the antitrust injury element of Cordes's and Creditors Trust's case is common to the class. There is only one type of injury alleged in the Complaint – overcharges paid due to a

price fixing conspiracy. Because each class member allegedly suffered the same type of injury, the legal question of whether such an injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful, *Brunswick*, 429 U.S. at 489, 97 S. Ct. 690, is a common one."

### D. It Was Error For The District Court To Reject Appellants' Expert's Common Formula For Calculating Aggregate Damages Since Appellees' Day-To-Day Data Was Not Always Available

Plaintiffs' expert proposed that "*the retail exchange rate overcharge* but-for Defendants' conspiracy to manipulate the FX Spot Market Rate, will be either 0.0003 (three percentage points or 'pips'), as determined by the U.S. Department of Justice or [his] estimate of the effect of the conspiracy on the spread of the EUR/USD exchange rate in the FX Spot Market during the conspiracy period (2007-2013)," (Saba Supplemental Report CJA 348, Dkt. No. 725 ¶¶24-26).[13]

---

[13] In *In re Publication Paper*, the court at 690 F.3d 66 further stated: "The Supreme Court has noted, for instance, that '[i]t is enough that the illegality is shown to be a material cause of the [antitrust] injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling [its] burden of proving compensable injury.'". *Zenith Radio v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9 (1969)…Relying on *Zenith Radio* our court has also observed that an antitrust defendant's unlawful conduct need not be the sole cause of the plaintiff's alleged injuries; to prove "causal connection" between the defendants' unlawful conduct and the plaintiff's injury, the plaintiff need only 'demonstrate that [the defendant's] conduct was a substantial or materially contributing factor' in producing that injury. "*Litton Sys., Inc. v. AT&T Co.*, 700 F.2d 785, 823 n. 49 (2d Cir. 1983*); see also U.S Football League v. Nat'l Football League*, 842 F.2d 1335, 1377 (2d Cir. 1988).

Because the district court overlooked Appellees' widening of the "two-price" bid/ask spread and adopted the incorrect single price "episodic" and "multi-directional" theories based on false intermittent, up-and-down manipulation of foreign exchange rates, it was led to the erroneous conclusion that "Plaintiffs cannot establish that class members were injured on any particular day without a day-to-day individualized analysis." It was error for the district court to rule that Appellants were required to establish that "class members were injured on any particular day" involving a "day-to-day" analysis, (Class Cert. Order SPA-1at p. 15), especially since the data produced by Appellees showed that day-to-day data was not always available for analysis as Appellees' expert Strombom stated in his Report:

"My review of the data produced by Defendants indicates that this information [day-to-day purchase details as to transaction dates, amount purchased, retail rate etc.] is not always available in Defendants' records. For example, Citibank data often do not identify the foreign currency purchased (or redeemed), and the data *never* specify the retail rate applied." (Expert Report of Bruce A. Strombom CJA-993 ¶70 at page 34, Dkt.735-1).

It was error for the district court to reject Appellants' expert's common formula for calculating aggregate damages since Appellees' expert admitted that Appellees' day-to-day data was not always available and since "Antitrust plaintiffs at class certification need not demonstrate through common evidence the amount of damages incurred by each class member…" *Sykes v. Mel S. Harris & Assoc. LLC*, 780 F.3d 70 at 82 (2d Cir. 2015).

In *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 452-459, 136 S. Ct. at 1045 (2016), the U.S. Supreme Court held that such "representative evidence here was a permissible means of showing [injury]" "to fill an evidentiary gap created by the employer's failure to keep adequate records." Where data is unavailable, a reasonable and probable estimate of damages should be submitted to the jury to avoid defendant from profiting from its own wrong. *Eastman Kodak of New York v. Southern Photo Materials Co.*, 273 U.S 359 (1927); *Story Parchment Co. v. Patterson Paper Parchment Co.*, 282 U.S. 555 (1931); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946); *Reiter v. Sonotone*, 99 S.Ct. 2326 (1979).

The district court erred in rejecting Saba's proposal to produce an "average estimate of damages," since there is no evidence that "it masks the existence of uninjured class members." The district court cited *In re Aluminum Warehousing Antitrust Litig.,* 336 F.R.D. 5, 62 (S.D.N.Y. 2020), in which that court acknowledged the general rule that "Price-fixing conspiracies …almost invariably injure everyone who purchases relevant goods or services, *Auction Houses Antitrust Litig.,* 193 F.R.D. 162 at 166 (S.D.N.Y. 2000)," but ruled that "this case [*Aluminum Warehousing*] is decidedly idiosyncratic" in that it departs from the "traditional" price-fixing conspiracy in that it "posit[s] a more elongated causal chain" between an alleged agreement to inflate the price of aluminum purchased from third party smelters, by loading excess aluminum and lengthening the queues at certain aluminum warehouses. The *Aluminum Warehousing* court then cited *Rail*

*Freight I,* 725 F. 3d 244 (D.C. Cir.) that rejected an average estimate of damages because the expert's report itself revealed that the class of all shippers included "legacy" shippers, who were uninjured class members because their contracts started before the commencement of the conspiracy. The *Aluminum Warehousing* court also cited *In re Lamictal Direct Purchaser* 957 F. 3d 184, 192 (3d Cir. 2020) where "plaintiffs' model impermissibly relies on averages which, in a market characterized by individual negotiations…masks the fact that many - up to one-third of the entire class likely paid no more or even less…; however, the *Lamactal* court later stated at p. 194: "While averages may be acceptable where they do not mask individualized injury…" Thus, the cases accept averaging, but they reject the use of averages where an expert's report itself reveals that the class includes uninjured parties, unlike Saba's reports. *See Hickory Securities Ltd. v. Republic of Argentina*, 493 Fed. Appx. 156, 159 (2d Cir. 2012) (holding that "[a]ggregate class-wide damages are not per se unlawful" so long as "the damage awards roughly reflect the aggregate amount owed to class members."

In *Gruber v. Gilbertson,* 2019 U.S. Dist. LEXIS 159767 at *25 (S.D.N.Y. 2019), the court certified a class where "[t]he damages model is generally the same [for all plaintiffs]—inflated price minus actual price."). In *Kurtz v. Kimberly-Clark Corp.,* 2019 U.S. Dist. LEXIS 185334 at *39-40 (E.D.N.Y. 2019), the court certified a class where "there is a market wide inflation of price by a particular percentage…There is no need for individualized inquiry as to causation or injury."). Here the Department of Justice

("DOJ") in imposing fines on Appellees based on the Plea Agreements utilized the common overcharge of .0003. (Dkt. No.730-15 at pp. 6-7). In a price-fixing case the amount of damages can be determined on a classwide basis. *In re Nasdaq Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 509, 518 (S.D.N.Y. 1996). In *Kleen Products LLC v International Paper Co.,* 831 F.3d 919 (7th Cir. 2016), the Seventh Circuit stated: "We held in *Loeb Indus., Inc. v. Sumitomo,* 306 F.3d 469 (7th Cir. 2002), that plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages *Id.* at 493. And we already have confirmed that at the class certification stage, plaintiffs are not obliged to drill downs and estimate each individual class member's damages. The determination of the adequate classwide damages is something that can be handled most efficiently as a class action, and the allocation of that total sum among class members can be managed individually, should the case ever reach that point."

Further, since liability for antitrust violations is joint and several, *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 635, 101 S.Ct. 2061, 2064, 68 L.Ed.2d 500 (1981), the class may recover its full aggregated loss from any defendant who can be shown to have participated in the alleged conspiracy. *Paper Sys. Inc. v. Nippon Paper Indus. Co.,* 281 F.3d 629, 633 (7th Cir. 2002). ("If they can prove that there was indeed a conspiracy, they may collect damages not just firm-by-firm according to the quantity sold, but from all conspirators for all sales. Each conspirator is responsible for the entire *aggregate* damages overcharge of all five manufacturers."). (Emphasis supplied).

**E. The District Court Erred In Rejecting "Purchases" Of FX By Credit Card, Debit Card And Wire From The Case By Denying Appellants Due Process And Disregarding Statutory Tolling, And The Class Is Ascertainable**

The definition of the putative class is alleged in the TAC JA-130, Dkt. No. 190 at ¶24, as follows:

"All consumers and businesses in the United States who directly purchased supra competitive foreign currency at Benchmark exchange rates from Defendants and their co-conspirators for their own end use at least since January 1, 2007 to December 31, 2013," [modified to December 31, 2013 by court order Dkt. No. 293 dated Mar. 12, 2018].

The District Court erred in its Conclusion of Law that "Purchase[d]" in Plaintiffs-Petitioners' Class Definition was confined to physically received foreign currency and excludes, wire transfers, or credit, debit and ATM transactions. At page 2, lines 18-21in its Class Cert. Order (SPA-1, Dkt. 776), the District Court stated:

"Plaintiffs' claims in this action are limited to transactions "involving foreign currency purchased with U.S. dollars and physically received at Defendants' retail branches within the United States." Order dated Sept. 6, 2018 (Dkt. No. 349) at 1,4. Plaintiffs' claims do not include "wire transfers" or "credit, debit and ATM card" transactions."

Appellees' expert Strombom testified that the definition of "purchase" is broad: "To provide something of value in exchange for something of value",

(Deposition of Strombom CJA 1432 at p.209: 2-10). Strombom's definition is broad enough to cover credit, debit, ATM and wire transactions. Equally broad is the Merriam-Webster Dictionary definition of "Purchase" to mean, "to obtain by money or its equivalent," and Adam Smith said that the mode of exchange could even be "nails" or "seashells." The district court erred in restricted "purchased" to exclude credit, debit, ATM and wire purchases, by finding incorrectly that the phrase "foreign currency retail transactions" and "physical" was used in the TAC, by failing to make findings in its June 20, 2018 Order that would enable Appellants to cure any deficiencies, and by failing to recognize that debit purchases were included in the TAC.

The district court further erred in failing to recognize that the purchase of FX is a stand-alone transaction separate from any subsequent wire transfer[14] because the subsequent wires are held to be merely "actions needed to carry out the transactions, and not the transactions themselves---which were previously entered into when the contracts [of purchase] were executed in Russia." as held in *Loginovskaya v. Batratchenko*, 764 F. 3d 266, 275 (2d Cir. 2014)." Consistent with the *Loginovskaya* holding, Appellants' expert Carl Saba testified that Plaintiff-Appellants' purchases of

---

[14] That the purchase of FX is a separate transaction from any subsequent FX wire transfer is further shown by the fact that they are governed by different law – the purchase of FX is governed by U.C.C. Article 2. whereas wire transfers are governed by UCC Article 4A.

FX were separate stand-alone transactions, and that any subsequent wire of the FX was a separate transaction. (Depo. Saba CJA-1473, Dkt. No. 816-10, 31:2-37:11).

**F. The Class Of Purchasers Is Ascertainable As An Objective Criterion And Supercompetitive Is Superfluous Since, Like "Damaged," It Applies To All Members Of The Class Of "Purchasers"**

All retail purchasers FX from Defendants are included in the class based on the objective criterion of "purchased," (TAC ¶24) *Price v. L'Oreal USA, Inc.,* 17 Civ. 614 (LGS) (S.D.N.Y, August 15, 2018) at p. 8 ("purchased" is ascertainable as an "objective criterion with definite boundaries."). All members of the class of retail purchasers suffered overcharge injury from Appellees' price-fixing and collusion to increase the offer prices in the spot market that were incorporated in their retail prices; thus, there is no need to litigate each class member's claim to determine who is in the class. In *Cordes & Co. Fin. Services v. A.G. Edwards & Sons*, 502 F.3d 91,106-107 (2d Cir. 2007), where, as here, "[t]here is only one type of injury alleged in the Complaint – overcharges paid due to a price fixing conspiracy, … each class member allegedly suffered the same type of injury…"

"Supercompetitive" is redundant and superfluous for like "damaged," it applies to all class members without individual scrutiny. *In re Initial Public Offering Sec. Litig.,* 671 F. Supp.2d 467, 491-492 (S.D.N.Y. 2009) ("…and were damaged thereby…is simply superfluous because an investor who is not damaged would not have a viable claim."). Accord: 1 William B. Rubenstein, Newburg On Class Actions sec. 3.6 (5th ed.) 9 Westlaw 2017. In *In re Petrobras Securities*, 862 F.3d250, 259-262 (2d Cir. 2017),

the court stated: "We hold that both class definitions [which included the phrase "and were damaged thereby"] satisfy the ascertainability doctrine."). Typicality and adequacy were shown below. *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29 (2d Cir. 2009), but were not challenged in the Class Cert. Order.

## II. The Summary Judgment Should Be Reversed Since Appellees' Admissions In Their Plea Agreements And June Declarations Raise Triable Issues of Fact And Law Regarding Injury-in-fact and Causation

### A. Since The Plea Agreements, The *Forex* Order, the *Forex* Jury Verdict And *Aiyer* Describe The Widening Of "Two-Way" Bid-Ask Spreads for The EUR/USD Currency Pair, It Was Error For The District Court To Grant Summary Judgment Based On The Fictitious "Episodic" And "Multi-Directional" Theories Wrongly Based On Single Price Up-And-Down FX Manipulation

Although the district court's *Forex* Order, the *Forex* jury verdict, the Second Circuit's *Aiyer* Order and Plea Agreements ¶4(e), ¶4(g) and ¶4(i) incorporated in the TAC, consistently show "two-way" pricing for bids and offers in the FX spot market for which Appellees conspired to widen the spread by *increasing the ask or offer price* to sell higher and decreasing the bid price to buy lower, the district court granted summary judgment based on the contrary single price up-and-down "episodic" and "multidirectional" theory, it erroneously applied in denying class certification. The district court stated: "As the Court held in denying class certification, the guilty pleas establish that the *effect* of the conspiracy was "multi-directional" and "episodic." (S.J. Order SPA-21 at page 8 lines 11-12).

But Appellees' Plea Agreements contain their admissions in ¶4(g) that they "engaged in a conspiracy to fix stabilize, maintain, increase or decrease the price of, and **rig bids and offers** for, the **EUR/USD currency pair** exchanged in the FX Spot Market by agreeing to eliminate competition in the purchase and sale for the **EUR/USD currency pair**…" Thus, ¶4(g) establishes the rigging of bids and offers in the "two-way" pricing of the EUR/USD currency pair and widening the spread between bid and offer as stated in the court's *Forex* Order and *Forex* jury verdict, by increasing the offer prices and decreasing the bid prices. Thus, the Plea Agreements themselves disprove the district court's "multi-directional" and "episodic" theories that are based on the erroneous notion that there is a single price in the spot market that "involves alleged intermittent, up-and-down manipulation of foreign exchange rates." (Class Cert Order SPA-1at p. 14), (controverted by the Declaration of Carl S. Saba In Rebuttal To March 4, 2021 Report of Bruce A. Strombom, (CJA-1510, Dkt. 816-13 ¶¶9-13). (Emphasis supplied).

In addition, Plea Agreement ¶4(g)'s reference to Appellees' conspiracy to…*rig bids and offers* for the EUR/USD *currency pair* exchanged in the FX Spot Market by agreeing to eliminate competition in the purchase and sale of the EUR/USD *currency pair*," and ¶4(i)'s reference to "… by withholding *bids and offers*," dovetail with ¶4(e), which states: "A dealer may provide price quotes to potential customers in the form of a "*bid/ask spread*," which represents the difference between the price at which the dealer is willing to buy the currency from the customer *(the "bid")* and the price at

which the dealer is willing to sell the currency to the customer (*the "ask"*) [*or offer*].[15]

The repeated use of "two-way" bids and offers in the Plea Agreements and widening them as described in the district court's *Forex* Order and *Forex* jury verdict establishes "two-way" pricing in the FX spot market. *Forex* at page 2, Case No. 1:13-cv-07789, Dkt. No. 1331. As Saba stated: "To widen the spread, in a way that is beneficial to Defendants, is to (a) decrease the bid price at which Defendants purchased the Euro and/or to (b) increase the ask [or offer] price at which Defendants sold the Euro." (Declaration of Carl Saba In Rebuttal To March 4, 2021 Report of Bruce A. Strombom (CJA-1510, Dkt. 816-13 ¶12.).

### B. There Are Triable Issues Of Fact And Law As To Whether The District Erred In Requiring Piecemeal, Day-To-Day Tracing Of Transactions Since Appellees Lacked Adequate Day-To-Day Transaction Records And Admitted To A Conspiracy That Corrupted The FX Spot Market In Its Entirety

Appellees' admissions of their conspiracy to fix prices and rig bids and offers in the FX spot market by eliminating competition, as admitted in ¶4(g) of the Plea Agreements, constitutes a single over-arching conspiracy that corrupted the entirety of the FX spot market by interfering with the free play of market forces. The district

---

[15] The references to two-way "bid and ask or offer" pricing in ¶4(g),(i) and (e) of the Plea Agreements is corroborated in ¶5 of the declaration of Rivet for Bank of America that "The combination of the Baseline Prices ("the prevailing spot market *bid and ask* prices for each relevant currency") plus the CG Markup determines the rates that the Bank charges customers for In-Branch Transactions for the day," and the declaration of Kunyk for Bank of America identifying "…the prevailing spot market *bid and ask* prices" as the "Baseline prices." (Emphasis supplied.

court erred in requiring "individualized proof of each trade and each trading day" (S.J. Order SPA-21 at p.14). In *United States v. Socony-Vacuum*, 310 U.S. 150, at 213 (1940) the Supreme Court held that because the elimination of competition in price-fixing agreements creates "the potential power to destroy or drastically impair the competitive system," they are unreasonable per se, "*without the necessity of minute inquiry whether a particular price is reasonable or unreasonable* as fixed and *without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day* whether it has become unreasonable through the mere variation of economic conditions…Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices, they would be interfering with the free play of market forces." [16] *United States v. Socony-Vacuum*, 310 U.S. 150, at 221-223. (1940). (Emphasis supplied).

 *Socony-Vacuum* holds a price-fixing agreement unreasonable because it corrupts the entirety of the FX spot market by interfering with the free play of market forces, without any piecemeal requirement for day-to-day, minute inquiry as to prices. Appellees' price-fixing agreement and elimination of competition is "so likely to result in artificially higher prices," that the "[price-fixing agreement itself] constitutes strong evidence that the alleged agreement caused at least some element of the subsequent price increases (e.g., amount or effective date), or, at a minimum, the inability of

---

[16] *Socony-Vacuum* is re-affirmed in *Gelboim v. Bank Am. Corp.,* 823 F.3d 759, 774 (2d. Cir. 2016).

plaintiffs to negotiate below the list price." *In re Publication Paper antitrust Litig.*, 690

F.3d 51, 66-67 (2d Cir. 2012);[17] *In re Actos End-Payor Antitrust Litig.,* 848 F.3d 89, 101

(2d Cir. 2017). ("Indeed, even at summary judgment, an antitrust plaintiff may be

entitled to a presumption of causation where the anticompetitive conduct 'is deemed

wrongful because it is believed significantly to increase the risk of a particular injury'

and that injury occurred.'"). In *Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690,

699 (1962), the Supreme Court rejected the district court's piecemeal day-to-day

assessment of Defendants' individual acts. ("In cases such as this, plaintiffs should be

given the full benefit of their proof, without tightly compartmentalizing the various

factual components and wiping the slate clean after scrutiny of each. . . [T]he

character and effect of a conspiracy are not to be judged by dismembering it and

viewing its separate parts, but only by looking at it as a whole. Our review of the

record discloses sufficient evidence for a jury to infer the necessary causal connection

between Appellees' antitrust violations and petitioners' injury… and it is the jury

which 'weighs the contradictory evidence and inferences' and draws 'the ultimate

conclusion as to the facts." Where, as here, Appellees' data is unavailable, a reasonable

and probable estimate of damages should be submitted to the jury to avoid a

defendant from profiting from its own wrong. *Eastman Kodak of New York v. Southern*

*Photo Materials Co.*, 273 U.S 359 (1927); *Story Parchment Co. v. Patterson Paper Parchment*

---

[17] Plaintiff Valarie Jolly testified as to her inability to negotiate below defendant JP Morgan
Chase & Co.'s exchange rate for euros.  Deposition of Valarie Jolly CJA-38, Dkt. No. 720-1, 72:2-
77:18.). *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 101 (2d Cir. 2017)

*Co.,* 282 U.S. 555 (1931); *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251 (1946); *Reiter v. Sonotone*, 99 S.Ct. 2326 (1979).

There are triable issues of fact and law as to whether the district court erred in requiring piecemeal, day-to-day tracing of transactions since Appellees lacked adequate day-to-day transaction records and admitted to a conspiracy that corrupted the FX Spot Market in its entirety by elimination of competition.

**C. There is a Triable Issue of Fact And Law As To Whether Appellees' Conspiracy to Eliminate Competition That had a "Direct Effect on Trade and Commerce" Was "Continuous and Uninterrupted" As Admitted in the Plea Agreements**

There is a triable issue of fact as to whether Defendants' admissions of "continuous and uninterrupted" price-fixing and agreeing to "eliminate competition," that "had a direct effect on trade and commerce" in ¶4(g),(i) and (j) of the Plea Agreements is contrary to the district court's erroneous statement at page 8 of its S.J. Order that "The conspiracy's impact may be episodic and multi-directional, even though the conspiracy itself is continuous and eliminates competition on a "constant" basis." In so stating, district court erred in law and fact, based on the district court's erroneous theory that there is a single price that moves up and down instead of the "two-price" bid and ask prices admitted in the Plea Agreements. There is a triable issue of fact and law as to the validity of the district court's contrary "episodic" and "multidirectional" theories that are based on the erroneous notion that there is a single price in the spot market that "involves alleged intermittent, up-and-down

manipulation of foreign exchange rates," (Class Cert Order at p.14) controverted by the Declaration of Carl S. Saba In Rebuttal To March 4, 2021 Report of Bruce A. Strombom, ( CJA-1510, Dkt. 816-13 ¶¶9-13) and by the district court's *Forex* Order and the *Forex* jury verdict.

It is black letter law that conspiracies are continuing "'through every moment of the [conspiracy's] existence,'" *Smith v. United States*, 568 U.S. 106 (2013), citing *Hyde v. United States*, 225 U.S. 347, 369 (1912); and "'A conspiracy thus continued is in effect renewed during each day of its continuance.'" *United States v Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) citing *United States v Borden Co.,* 308 U.S. 188, 202 (1939). Indeed, the only way "'[T]o avert a continuing criminality' there must be 'affirmative action…to disavow or defeat the purpose' of the conspiracy. *Hyde, supra*, at 369." *Smith v. United States, supra*; *see also United States v. Gypsum Co.,* 438 U.S. 422 (1978).

## Conclusion

For all of the above reasons, the district court's Order denying class certification and its Order granting summary judgment should be reversed and remanded for trial on the merits.

Dated: August 2, 2023  Respectfully submitted,

/s/ *Joseph M. Alioto*
Joseph M. Alioto (*pro hac vice*)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
Phone: (415) 434-8900
Email: jmalioto@aliotolaw.com

Christopher Nedeau (CA SBN 81297)
NEDEAU LAW FIRM
154 Baker Street
San Francisco, CA 94117
Phone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

Lawrence G. Papale (CA SBN 67068)
LAW OFFICES OF LAWRENCE G. PAPALE
1308 Main Street Suite 117
St. Helena, CA 94574
Phone: (707) 963-1704
Email: lgpapale@papalelaw.com

Law Offices of Lingel Winters
One Sansome Street, 35th Floor
San Francisco, CA 94104 Phone:
(415) 613-1414
Email: sawmill2@aol.com

*Attorneys for Plaintiffs*

## Certificate of Compliance
## with Fed. R. App. 32(a)(7)

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13671 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Garamond font.

Executed on August 2, 2022.

*/s/ Joseph M. Alioto*
Joseph M. Alioto

**Certificate of Service**

I hereby certify that on August 2, 2023, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Second Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.

/s/     *Joseph M. Alioto*
Joseph M. Alioto

# SPECIAL APPENDIX

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Opinion and Order of the Honorable Loran G.
 Schofield, dated March 18, 2022 ........................... SPA-1

Opinion and Order of the Honorable Loran G.
 Schofield, dated March 29, 2023 .......................... SPA-21

Judgment, entered on March 30, 2023 ...................... SPA-34

Letter Order of the Honorable Loran G. Schofield,
 dated April 11, 2023 .............................................. SPA-35

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                      :
JOHN NYPL, et al.,                          :
                                        :
                         Plaintiffs,  :        15 Civ. 9300 (LGS)
                                        :
             -against-             :        OPINION AND ORDER
                                        :
JP MORGAN CHASE & Co., et al.,       :
                                        :
                          Defendants. :
-------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

     This case concerns the impact of an alleged conspiracy among banks to fix prices in the foreign exchange ("FX") market on consumers' purchases of foreign currency with U.S. Dollars within the United States. Plaintiffs move to certify a class pursuant to Federal Rule of Civil Procedure 23(b)(3) and for appointment of class counsel pursuant to Rule 23(g). Defendants Bank of America, N.A., Bank of America Corporation, Barclays Capital, Inc., Barclays PLC, Citibank, N.A., Citicorp, Citigroup, Inc., HSBC Bank (USA), N.A., HSBC North American Holdings Inc., JP Morgan Chase & Co., JPMorgan Chase Bank, N.A., Royal Bank of Scotland, plc, and UBS AG ("Defendants") move to exclude the report and testimony of Plaintiffs' expert Carl S. Saba. Plaintiffs move to exclude the rebuttal report and testimony of Defendants' expert Bruce A. Strombom. For the reasons below, the motion for class certification is denied. Defendants' *Daubert* motion is granted in part and denied in part. Plaintiffs' *Daubert* motion is denied.

## I.    BACKGROUND

     Familiarity with the underlying facts and procedural history is assumed. *See Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) (granting in part Plaintiff's motion for leave to file the Third Amended Complaint); *Nypl v. JPMorgan*

*Chase & Co.*, No. 15 Civ. 9300, 2018 WL 1276869 (S.D.N.Y. Mar. 12, 2018) (denying

Defendants' motion to dismiss the Third Amended Complaint and granting in part Defendants'

motion to limit the time period for Plaintiffs' claims).  The facts below are taken from the parties'

submissions in connection with the pending motions, and the Court resolves factual disputes as

necessary for the disposition of the motions.  *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,

659 F.3d 234, 251 (2d Cir. 2011); *accord Clune v. Barry*, No. 16 Civ. 4441, 2019 WL 3369455,

at *2 (S.D.N.Y. July 26, 2019).

In sum, Plaintiffs, a group of individuals and businesses, allege that they purchased

foreign currency from Defendants in the consumer retail market at manipulated rates.  Plaintiffs

allege that Defendants conspired to manipulate certain benchmark exchange rates that determined

the retail prices they paid for foreign currency.  The Plaintiffs base this allegation on plea

agreements and government orders involving certain Defendants.  Those plea agreements and

Plaintiffs' allegations focus on two benchmarks:  the WMR London closing fix ("the WMR fix")

and the European Central Bank fix (the "ECB fix").  Defendants have presented uncontroverted

evidence that they did not calculate retail exchange rates for consumers, such as Plaintiffs, based

on the WMR and ECB fix benchmarks.  Instead, each Defendant's rate was calculated by, or

using data from, a third-party.

Plaintiffs' claims in this action are limited to transactions "involving foreign currency

purchased with U.S. Dollars and physically received at Defendants' retail branches within the

United States."  Order dated Sept. 6, 2018, (Dkt. No. 349) at 1, 4.  Plaintiffs' claims do not

include "wire transfers" or "credit, debit and ATM card" transactions.  *Id.*

## II.   DISCUSSION

Plaintiffs seek to certify a nationwide class of "consumers and businesses in the United States who directly purchased supracompetitive foreign currency at Benchmark exchange rates from Defendants and their co-conspirators for their own end use" from January 1, 2007, to December 31, 2013.

### A.   Daubert Motions

Plaintiffs and Defendants have each submitted an expert report in support of their respective positions on whether the putative class should be certified.  In sum, Plaintiffs' expert opines that causation and damages can be proved on a class-wide basis, thereby supporting Plaintiffs' argument that common issues predominate as required for class certification under Rule 23(b)(3).  Defendants' expert critiques Plaintiffs' expert and opines that damages and the related issue of injury-in-fact cannot be proved on a class-wide basis.  Both Plaintiffs and Defendants have filed a *Daubert* motion to exclude the opinions of the other's expert.  For the reasons below, Plaintiffs' motion is denied, and Defendants' motion is granted in part to exclude the regression analyses of Plaintiff's expert and denied in part.

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if [] (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

District courts play a "'gatekeeping' function" under Rule 702 and are "charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task

3

at hand.'" *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. I₁)*, 982 F.3d 113, 122-23 (2d Cir. 2020) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).  A Rule 702 inquiry focuses on three issues: (1) whether a witness is qualified as an expert, (2) whether the witness's "opinion is based upon reliable data and methodology" and (3) whether "the expert's testimony (as to a particular matter) will assist the trier of fact."  *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005) (internal quotation marks and citations omitted); *accord In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 543 (S.D.N.Y. 2021). "[A] slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible."  *United States v. Jones*, 965 F.3d 149, 160 (2d Cir. 2020).  The party proffering the expert bears the burden of establishing Rule 702's admissibility requirements by a preponderance of the evidence.  *Id.* at 161.

The *Daubert* and Rule 702 concepts of "gatekeeping" and admissibility seem ill suited for a class certification motion, which is solely determined by the Court.  There is no jury, no "gate" requiring threshold determinations of reliability, and no admission or exclusion of testimony before a separate fact finder.  In substance, every objection goes to the weight of the expert's testimony.  Although "[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage," it has "offered limited dicta suggesting that a *Daubert* analysis may be required at least in some circumstances." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013); *accord In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D 5, 28-29 (S.D.N.Y. 2020).  Because of this dicta, because Rule 702 provides a useful framework for evaluating expert testimony and because the parties have filed *Daubert* motions, this Opinion briefly addresses those motions separately before turning to Plaintiffs' class certification motion.

4

### 1. **Plaintiffs' Expert Carl S. Saba**

Defendants' motion to exclude the opinions of Plaintiffs' expert witness Carl S. Saba is granted in part and denied in part. Saba offers two opinions in support of class certification. First, Mr. Saba offers a causation opinion based on regression analyses -- that the FX Spot Market price, which Defendants allegedly manipulated, closely correlates with, and directly impacted, the end-user prices that class members paid on any given day for foreign currency. This opinion is in support of Plaintiff's argument that causation and injury can be proved on a class-wide basis.

Defendants argue Saba's regression analyses should be excluded because (i) they simply confirm uncontested facts, specifically that Defendants used early morning FX spot rates to calculate retail rates and (ii) Saba's underlying data is untethered to relevant facts because it analyzes transactions that are either wire transfers or were made in 2017, neither of which are relevant in this case. Plaintiffs do not directly address Defendants' second argument or attempt to justify why their expert relied on wire transfers for currency purchases, which are not at issue in this action, or transactions from 2017, which are outside of the class period. Because the regression analyses are based on data untethered to the facts of this case and Plaintiffs offer no basis to justify this shortcoming, the Saba report's regression analyses are not considered. *See Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315-16 (S.D.N.Y. 2015) (excluding expert report where its modeling was "largely untethered from the actual facts" of the case).

Second, Mr. Saba opines that the aggregate amount of damages to class members can be determined on a class-wide basis by multiplying the overcharge Defendants caused by the volume of affected commerce. He asserts that the overcharge will be either 0.0003 (three percentage points or "pips") utilized by the Department of Justice or his own estimate of the effect of the

conspiracy on the exchange rate spread, with two examples of how the estimate might be made. He asserts that the volume will be based on the aggregate market share of Defendants in the relevant class transactions. Defendants do not challenge the basic formula for computing damages in an antitrust price manipulation case. Their objection is that Mr. Saba's methodology is unreliable because he fails to explain specifically how to determine the two variables in the formula -- overcharge and volume. Defendants affirmatively argue, supported by their own expert, that these issues cannot be determined on a class-wide basis in this case.

Because Mr. Saba's opinion is helpful in framing critical issues on this class certification motion -- namely whether there is a viable methodology for Plaintiffs to use common, class-wide proof to show injury-in-fact and damages -- his damages opinion is not excluded. That does not mean that his opinion is accepted as sufficient. The "rigorous analysis" of his damages model required by *Comcast* follows below. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[F]or purposes of Rule 23, courts must conduct a rigorous analysis to determine whether [a model supporting a plaintiff's damages case measures damages consistent with plaintiff's theory of the case]." (internal quotation marks omitted)).

### 2. Defendants' Rebuttal Expert Dr. Bruce A. Strombom

Plaintiffs' motion to exclude the testimony of Defendants' rebuttal expert witness Dr. Bruce A. Strombom is denied. Dr. Strombom offers two relevant opinions[1] -- first, that Mr. Saba fails to establish that Plaintiff can use class-wide proof to show causation and injury. Second, Dr. Strombom challenges Mr. Saba's opinion that damages can be shown using class-wide proof for

---

[1] Dr. Strombom's opinion criticizing Mr. Saba's regression analyses as flawed and unreliable is not discussed, since Defendants do not dispute the close correlation that the regression analyses show.

several reasons. One of these is that Mr. Saba "fails to account for netting and offsetting redemptions."

Plaintiffs argue that the netting of damages is contrary to principles of antitrust law and that Dr. Strombom is not qualified for asserting otherwise. This argument is incorrect. That plaintiffs in an antitrust action may recover only for their net injury is a common-sense and well-established principle. *See Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 563 (S.D.N.Y. 2017) ("[A]ny damages would need to be netted out as to each plaintiff to offset any benefit from defendants' manipulation in other transactions."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2016 WL 7378980, at *18 (S.D.N.Y. Dec. 20, 2016) ("[P]laintiffs may ultimately recover only to the extent of their net injury, given that plaintiffs may well have benefited from LIBOR suppression in the same transaction or in a different transaction."), *rev'd and remanded on other grounds*, *Berkshire Bank v. Lloyds Banking Grp. plc,* No. 20-1987 Civ., 2022 WL 569819 (2d Cir. Feb. 25, 2022); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 489 (S.D.N.Y. 1987) ("An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct." (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986))).

Relying on *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), and other cases, Plaintiffs erect a straw man to argue that netting damages is not permitted. *Hanover Shoe*, however, does not stand for that proposition but instead addresses the so-called "passing on" defense. The defendant had asserted that the plaintiff suffered no cognizable injury because the plaintiff had passed on the unlawful overcharge to its customers. *Id.* at 487-88. The

Supreme Court rejected this defense and held that the plaintiff had proved injury and the amount of its damages with proof that the defendant had overcharged it and the amount of the overcharge. *Id*. at 494. Passing on is not at issue in the instant case and is distinct from netting damages, which means here that, if illegal conduct caused a particular plaintiff both gains and losses, that plaintiff can recover only its net losses.

Plaintiffs also misconstrue Dr. Strombom's report to argue that it "opines that the price fixing conspiracy was 'episodic'" and therefore "contrary to the law." Dr. Strombom's report does not refer to the conspiracy as episodic, but rather refers to the underlying attempts at manipulation as episodic and multidirectional, consistent with the descriptions in the plea agreements that Plaintiffs relied on in bringing this case.

Plaintiffs' remaining arguments have no relation to Dr. Strombom's report, Rule 702 or the *Daubert* standard. For example, Plaintiffs cite three Supreme Court cases from the second quarter of the twentieth century to argue the existence of commonality among Plaintiffs, but do not connect those cases to any aspect of Dr. Strombom's report or testimony.

Plaintiffs' challenges to Dr. Strombom's opinions are without merit, and their motion to exclude his opinions is denied.

### B. Article III Standing

Defendants argue that none of the four named Plaintiffs have demonstrated Article III standing. As explained below, named Plaintiffs Lisa McCarthy and Valarie Jolly have sufficiently shown for this stage of the litigation that they have Article III standing to assert the two remaining causes of action -- price fixing in violation of Section 1 of the Sherman Act and its California counterpart, the Cartwright Act. Because only one named plaintiff must have standing with respect to each claim, *see Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 84 n.2 (2d Cir.

2012), the standing of Plaintiffs Rubinsohn and Nypl is not addressed.  The Court previously dismissed the California Unfair Competition Law claim because Nypl, the only Plaintiff to assert that claim, lacks standing to assert it.

"Article III standing has three elements: (i) 'the plaintiff must have suffered an injury in fact' that is 'concrete and particularized' as well as 'actual or imminent'; (ii) 'there must be a causal connection between the injury and the conduct complained of'; and (iii) 'it must be likely . . . that the injury will be redressed by a favorable judicial decision." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 381 (2d Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)), *cert. denied*, 142 S. Ct. 757 (2022).  Standing must be demonstrated for each claim.  *Town of Chester v. Laroe Estate, Inc.*, 137 S Ct. 1645, 1650 (2017).

The Second Circuit has not decided whether Plaintiffs may rely on their pleadings or must proffer evidence to show standing at the class certification stage.  *See Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85 (2d Cir. 2019) ("[W]e need not, and do not, decide whether plaintiffs generally may rely on allegations in their complaint to establish standing at the class-certification stage.").  The elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561; *accord In re GE/CBPS Data Breach Litig.*, No. 20 Civ. 2903, 2021 WL 3406374, at *4 (S.D.N.Y. Aug. 4, 2021).  "[T]he showing that must be made in order to withstand a dismissal for lack of standing increases as the suit proceeds."  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).  At the class certification stage, "Rule 23 does not set forth a mere pleading standard" and

"[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Factual findings at the class certification stage are based on the preponderance of the evidence standard. *Mazzei v. Money Store*, 829 F.3d 260, 268 & n.8 (2d Cir. 2016). It follows that Plaintiffs must proffer some evidence at the class certification stage to show that it is more likely than not that they have standing. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 531-32 (S.D.N.Y. 2018).

Plaintiffs have alleged that McCarthy and Jolly suffered an injury traceable to Defendants as a result of their purchase of foreign currency because Defendants and their co-conspirators manipulated the rate at which the U.S. Dollar and foreign currencies are exchanged. Based on the discovery in this case so far, Plaintiffs have shown that McCarthy and Jolly directly purchased foreign currency from at least one Defendant. Defendants do not dispute this evidence at this time. This is sufficient to show standing at this time.

To require more granular evidence of injury at this stage of the litigation, as Defendants urge, would collapse the standing inquiry into the merits inquiry, a practice disfavored in this Circuit. *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 212 (2d Cir. 2020) ("We have cautioned against arguments that would essentially collapse the standing inquiry into the merits . . . ." (internal quotation marks omitted)). After discovery showing the extent of Plaintiffs' injuries, if any, "Defendants may certainly test [Plaintiffs'] standing . . . by requesting an evidentiary hearing or by challenging [Plaintiffs'] standing on summary judgment or even at trial." *Baur v. Veneman*, 352 F.3d 625, 642 (2d Cir. 2003); *accord A.H. v. French*, No. 20 Civ. 151, 2021 WL 3619688, at *10 (D. Vt. Aug. 16, 2021).

### C.  Class Certification

Plaintiffs seek to certify a class under Federal Rule of Civil Procedure 23(b)(3) of all consumers and businesses in the United States who directly purchased supracompetitive foreign currency at Benchmark exchange rates from Defendants and their co-conspirators for their own end use at least since January 1, 2007, to December 31, 2013.  Class certification is denied because Plaintiffs have not shown that common questions will predominate over individual questions, and because the proposed class is a "fail-safe class."

Federal Rule of Civil Procedure 23(a) provides that plaintiffs may sue on behalf of a class where:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Where, as here, class certification is sought pursuant to Rule 23(b)(3), a plaintiff must also show (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The Second Circuit "has also 'recognized an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'"  *In re Petrobras Secs.*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)); *accord In re Kind LLC "Healthy & All Nat." Litig.*, 337 F.R.D. 581, 594 (S.D.N.Y. 2021).

The Second Circuit gives Rule 23 a "liberal rather than restrictive construction, and courts are to adopt a standard of flexibility."  *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)

(citation omitted); *accord B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, No. 17 Civ. 2738, 2021 WL 234550, at \*9 (S.D.N.Y. Jan. 19, 2021).  Plaintiffs nevertheless must establish by a preponderance of the evidence that each of Rule 23's requirements is met.  *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 264 (2d Cir. 2016); *accord In re Perrigo Co. PLC Secs. Litig.*, 493 F. Supp. 3d 291, 294 (S.D.N.Y. 2020).  A certifying court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Shahriar*, 659 F.3d at 251 (citing *In re IPO Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006)); *accord In re Perrigo Co.*, 493 F. Supp. 3d at 294.

### 1. Predominance

Plaintiffs have failed to establish predominance -- that common issues will predominate over issues affecting only individual class members.  *See* Fed. R. Civ. P. 23(b)(3).  "The [predominance] requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020) (internal quotation marks omitted).  "The requirement's purpose is to ensure that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Mazzei*, 829 F.3d at 272 (internal quotation marks and alteration omitted); *accord Scott,* 954 F.3d at 513.

To determine predominance, a court "must assess (1) the elements of the claims and defenses to be litigated, (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each

class member's entitlement to relief, and (3) whether the common issues can profitably be tried on a class[-]wide basis, or whether they will be overwhelmed by individual issues." *Scott*, 954 F.3d at 512 (internal quotation marks omitted). "This analysis is 'more qualitative than quantitative,' and must account for the nature and significance of the material common and individual issues in the case." *Petrobras*, 862 F.3d at 271 (quoting 2 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 4:50, at 197 (5th ed. 2012)) (citing *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)). Two predicate questions must be addressed in the predominance analysis: (1) whether a given issue is "material to Plaintiffs' class claims," and (2) whether determination of that issue is "susceptible to generalized class-wide proof." *Petrobras*, 862 F.3d at 271. "Plaintiffs need not prove, however, that the legal or factual issues that predominate will be answered in their favor." *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 61 (2d Cir. 2020) (summary order) (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013)).

"The three required elements of an antitrust claim are (1) a violation of antitrust law; (2) injury and causation; and (3) damages." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) (alterations omitted); *accord In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 435 (S.D.N.Y. 2019). "The analysis of claims brought under California's Cartwright Act 'mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act.'" *FTC v. Shkreli*, No. 20 Civ. 706, 2022 WL 135026, at *34 (S.D.N.Y. Jan. 14, 2022) (quoting *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (citation omitted)); *see also Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F. 4th 103, 120-21 (2d Cir. 2021) (discussing the instructiveness of federal antitrust statutes for analysis of the Cartwright Act). The parties do not dispute that proof common to the class can be offered to show a violation of antitrust law,

here a conspiracy to fix prices.  But individualized proof of each trade and each trading day will be required to show if and to what extent each retail purchaser was actually injured by the alleged conspiracy.  With the retail purchases at issue during a putative class period extending from 2007 to 2013, the evidence would be overwhelming.

The issue of whether and to what extent each purchaser was injured by the alleged conspiracy is obviously material to (1) the cause of action which requires proof of injury, causation and damages, (2) standing which requires proof of injury-in-fact, and (3) class membership as discussed below under the heading fail-safe class.  The nature of the alleged conspiracy in this case is the reason that common proof will not suffice.  This case involves alleged intermittent, up-and-down manipulation of foreign exchange rates resulting in a proposed class of retail purchasers, each of whom may have been benefitted, harmed or unaffected by the alleged manipulated prices.  That is what is meant by describing the conspiracy as "episodic" and "multi-directional."  These terms do not excuse or mitigate the allegedly unlawful conduct, as Plaintiffs seem to think, but they do describe characteristics of the conspiracy that is alleged.

The resulting fact-intensive inquiries would far outweigh any economies achieved through certification of the putative class under Rule 23(b)(3).  *See Mazzei*, 829 F.3d at 272 (upholding decertification where "the fact-finder would have to look at every class member's loan documents to determine who did and who did not have a valid claim"); *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, No. 14 Civ. 8175, 2018 WL 679495, at *5 (S.D.N.Y. Feb. 1, 2018) (declining to certify class where standing and class membership would need to be determined on individual basis); *see also Petrobras*, 862 F.3d at 274 ("The predominance analysis must account for such individual questions, particularly when they go to the viability of each class member's claims.").

SPA-15

Some of those individualized inquiries are described below.  Because Plaintiff has not shown that common issues predominate, class certification is denied.

### a.  Individualized Proof of Manipulation on Each Transaction Day (Injury and Causation)

Plaintiffs have not proposed a methodology to show through common proof the days and times that Defendants allegedly manipulated benchmark rates, which benchmark was manipulated or the direction in which spot market prices allegedly were moved.  Plaintiffs cannot establish that class members were injured on any particular day without a day-by-day individualized analysis.

The question of whether class members purchased foreign currency on a day that prices were manipulated is not susceptible to generalized proof.  The conduct Plaintiffs allege was multi-directional and episodic.  There is no evidence that manipulative conduct occurred every day during the class period.  Even the plea agreements appended to the complaint describe the collusive conduct as "near daily."  Nor is there evidence that the conspiracy had a consistent effect every day of the class period.  Even assuming manipulative conduct every day, nothing in the record shows a consistent effect of the manipulation and whether it acted to putative class members' benefit or detriment on any given transaction.  Plaintiff's expert, Mr. Saba, did not propose a methodology for identifying when and by how much particular spot market rates may have been manipulated on particular days, and admitted that without that information he could not determine if a retail customer paid a "supracompetitive" exchange rate -- in other words, whether the customer was injured by unlawful conduct.

Plaintiffs contend that no individualized inquiry is necessary because the plea agreements show that the spot market prices were corrupted, and Defendants incorporated those prices into

the retail market.  But Plaintiffs ignore the aspects of the plea agreements that contradict their argument.  The plea agreements state that the traders attempted to move benchmarks sometimes downward and sometimes upward.  And the TAC alleges a conspiracy to "increase or decrease prices."  Plaintiffs point to no evidence that the manipulation consistently resulted in an overcharge.  Plaintiffs' argument that no individualized inquiry is required because the class, by definition, includes only those who were overcharged misses the point. Plaintiffs offer no method of proving on a generalized basis who was or was not overcharged.

Plaintiffs cite *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018), to argue that the damages in this case are susceptible to common proof, but *LIBOR* is distinguishable.  The Court in *LIBOR* emphasized that the certified OTC class could establish injury with common proof -- that plaintiffs "will need to offer classwide evidence that actual published LIBOR was suppressed" because the plaintiffs alleged that the defendants persistently suppressed the benchmark and thereby moved prices in only one direction.  *LIBOR*, 299 F. Supp. 3d at 472, 590, 595.  Plaintiffs' proposed class in this case is much more like the class rejected in *LIBOR*.  The rejected class, like the class Plaintiffs propose, was "indeterminate not only as to the days on which trader-based manipulation occurred, but also the direction of manipulation on those days."  The court in *LIBOR* aptly held that "[d]irectional differences" in the alleged manipulation were "particularly corrosive" for purposes of class certification.  *Id.* at 538-39.

### b.  Individualized Proof of the Amount of Damages

Plaintiffs have not proposed a reliable methodology for calculating damages through common proof.  Plaintiffs, relying on Mr. Saba's report, contend that damages can be proven on a class-wide basis by applying the overcharge used by the Department of Justice in calculating the

recommended fine in the Plea Agreements or determining some other overcharge. But there is no evidence that the rate of any overcharge was consistent, or that Mr. Saba's proposed rate of overcharge -- three pips utilized by the Department of Justice or some other not-yet-determined rate -- has any factual or evidentiary relationship to what occurred. Mr. Saba's proposal necessarily produces an average estimate of damages. That approach is particularly inapt in this case because it "masks the existence of uninjured class members." *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 62 (S.D.N.Y. 2020). Plaintiff's model provides no means of screening out these class members.

Individualized proof would also be necessary to determine a purchaser's net damages. As discussed above, damages incurred in one transaction must be reduced by any benefit the purchaser may have received in other transactions. *See Sonterra*, 277 F. Supp. 3d at 563; *In re LIBOR*, 2016 WL 7378980, at *18. If a putative class member purchased currency on a day with decreased prices due to manipulation and purchased currency on a different day with increased prices due to manipulation, the effect of the manipulation needs to be netted out for that class member. Plaintiffs have offered no basis for using common proof to calculate the net damages suffered by putative class members.

### 2. Fail-Safe Class

Class certification is denied for the additional reason that the proposed class is a "fail-safe" class. The proposed class is limited to those who "purchased supracompetitive foreign currency." The inclusion of "supracompetitive" in the class definition makes the class a fail-safe class, which would require litigation of each class member's claim on the merits to determine who is in the class. These manageability problems can be characterized as undermining superiority -- the Rule 23(b)(3) requirement that a class action be superior to other methods of

adjudication.[2]  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp 3d 430, 529 (S.D.N.Y. 2018) (noting that some courts have held that "fail-safe classes create manageability problems bearing on superiority under Rule 23(b)(3)").

A fail-safe class requires a court to decide the merits of individual class members' claims to determine class membership.  *In re Rodriguez*, 695 F.3d 360, 369-70 (5th Cir. 2012) ("A fail-safe class is a class whose membership can only be ascertained by a determination of the merits of the case because the class is defined in terms of the ultimate question of liability.").  Courts in this circuit typically refuse to certify fail-safe classes unless the fail-safe aspect can be overcome by redefining the class or some other means.  *See, e.g.*, *DiDonato v. GC Servs. Ltd. P'ship*, No. 20 Civ. 2154, 2021 WL 4219504, at *8 (S.D.N.Y. Sept. 16, 2021); *Bondi v. New Rochelle Hotel Assocs.*, No. 17 Civ. 5681, 2018 WL 7246962, at *14 (S.D.N.Y. Dec. 7, 2018), *R. & R. adopted*, No. 17 Civ. 5681, 2019 WL 464821 (S.D.N.Y. Feb. 6, 2019).

"[F]ail-safe classes tend to be defined in terms of a 'legal injury' or 'by reference to a particular statute, regulation, or contract that has been allegedly violated or breached.'"  *Garcia v. Execu|Search Grp., LLC*, No. 17 Civ. 9401, 2019 WL 689084, at *2 (S.D.N.Y. Feb. 19, 2019) (quoting *Gregory v. Stewart's Shops Corp.*, No. 14 Civ. 33, 2016 WL 8290648, at *18 (N.D.N.Y. July 8, 2019)).  Such classes can be problematic for two reasons.  First, they may be unfair to the defendant because they may give a plaintiff a second, unwarranted chance to establish liability.  Second, the class may be unmanageable because a determination on the merits would be required

---

[2] Defendants make this argument invoking requirement that the class be "ascertainable."  But their objection is not that class membership cannot be determined with objective criteria, rather that this determination would be too onerous.  The Second Circuit has expressly declined to incorporate a requirement of administrative feasibility into the ascertainabiltiy doctrine.  *In re Petrobras Sec.*, 862 F.3d 250, 264-65 (2d Cir. 2017).

to identify class members who would receive notice and an opportunity to opt out.  *See Ford v. TD Ameritrade Holding Corp.*, 995 F.3d 616, 624 (8th Cir. 2021) (refusing to certify fail-safe class where the class definition included two contested elements of liability because certification would allow putative class members to seek a remedy but not be bound by an adverse judgment, and because the class was unmanageable because it could not be determined to whom notice should be sent); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019) (declining to "promot[e] a so-called "fail-safe" class[], whose membership can only be determined after the entire case has been litigated and the court can determine who actually suffered an injury").

Here the same individualized inquiries that defeat the predominance requirement make the class definition unmanageable as a fail-safe class.  By incorporating the merits inquiry into the class definition, the individual inquiries would first arise in the Rule 23(b)(3) notice process in order to determine who receives notice of the class action.  As discussed above, the alleged benchmark manipulation was not unidirectional, so putative class members could have made money, lost money or experienced no impact for each purchase they made.  Plaintiff has offered no means to determine class membership based on common evidence or in some other administratively feasible way.  The inclusion of "supracompetitive" in the class definition makes this an impermissible "fail-safe" class.  *See generally LIBOR*, 299 F. Supp. 3d at 528-29 (discussing the propriety of certifying fail-safe classes).

Plaintiffs incorrectly argue that the inclusion of "supracompetitive" is superfluous, so its inclusion does not create a bar to certification.  But, if "supracompetitive" is omitted from the class definition, the class would be impermissibly overbroad because Plaintiffs have not offered any evidence to suggest that every purchaser of foreign currency from 2007 to 2013 experienced an injury or harm.  Plaintiffs argue that all retail purchasers of foreign currency from Defendants

19

are included in the class definition because the retail market was corrupted by the incorporation of spot market prices in retail prices, but as discussed above, this argument masks that some purchasers experienced no economic harm and may have benefitted from the alleged manipulation.

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for Rule 23 class certification is DENIED. Defendants' *Daubert* motion is GRANTED IN PART and DENIED IN PART.  Plaintiffs' *Daubert* motion is DENIED.  The request for oral argument is denied as moot.  The Clerk of Court is directed to close the motions at Dkt. Nos. 716, 731 and 745.

Dated: March 18, 2022
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                              :
JOHN NYPL, et al.,                      :
                       Plaintiffs,   :
                                :          15 Civ. 9300 (LGS)
           -against-         :
                                :      **OPINION AND ORDER**
JP MORGAN CHASE & CO., et al.,     :
                    Defendants.  :
--------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

     This case concerns the impact of an alleged conspiracy among banks to fix prices in the

foreign exchange ("FX") market on consumers' purchases of euros with U.S. Dollars within the

United States.  Defendants JP Morgan Chase & Co. and JPMorgan Chase Bank, N.A.

(individually or together, "JPMC"); Defendants Citibank, N.A., Citicorp, and Citigroup, Inc.

(collectively, "Citi"); Defendants Barclays Capital, Inc. and Barclays PLC (collectively,

"Barclays"); and Defendants Bank of America, N.A.; Bank of America Corporation; HSBC Bank

(USA), N.A.; HSBC North American Holdings Inc.; Royal Bank of Scotland, plc ("RBS") and

UBS AG ("UBS") move for summary judgment on Plaintiffs' remaining claims.  For the reasons

below, Defendants' motion is granted.

## I.    BACKGROUND

     Familiarity with the underlying facts and procedural history is assumed.  *See Nypl v. JP*

*Morgan Chase & Co.*, No. 15 Civ. 9300, 2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) (denying

Plaintiffs' motion for class certification, granting in part Defendants' *Daubert* motion and

denying Plaintiffs' *Daubert* motion); *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2017

WL 3309759 (S.D.N.Y. Aug. 3, 2017) (granting in part Plaintiffs' motion for leave to file the

Third Amended Complaint); *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2018 WL

1276869 (S.D.N.Y. Mar. 12, 2018) (denying Defendants' motion to dismiss the Third Amended

Complaint and granting in part Defendants' motion to limit the time period for Plaintiffs' claims). The following facts are drawn from the parties' Rule 56.1 statements and other submissions on this motion. The facts are undisputed or based on record evidence drawing all reasonable inferences in favor of Plaintiffs as the non-moving parties. *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. C & S Wholesale Grocers, Inc.*, 24 F.4th 163, 170 (2d Cir. 2022).

In short, Plaintiffs allege that they purchased euros at manipulated rates from Defendants in the consumer retail market. Because Plaintiffs' pleadings did not provide notice that any Plaintiff sought to recover for credit, debit, wire or other non-physical currency transactions or any transactions made abroad, Plaintiffs' claims are limited to transactions "involving foreign currency purchased with U.S. Dollars and physically received at Defendants' retail branches within the United States." Order dated Sept. 6, 2018, at 1, 4 (Dkt. No. 349). These transactions are referred to below as "qualifying transactions" or "qualifying purchases."

Plaintiffs allege that Defendants conspired to manipulate exchange rates in the FX spot market that then were used to calculate the prices charged to retail customers. Plaintiffs base this allegation on plea agreements and regulatory orders involving certain Defendants. Those plea agreements and the allegations in Plaintiffs' Third Amended Complaint ("TAC") focus on two benchmarks: the WMR London closing fix ("the WMR fix") and the European Central Bank fix (the "ECB fix"). Plaintiffs also now assert that those plea agreements and other documents show that Defendants conspired to manipulate "market prices generally" and to widen bid/ask spreads.

## II.   STANDARD

Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable [finder of fact] could return a verdict for a nonmoving party." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242

(2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).  In evaluating a motion for summary judgment, a court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk Cty.*, 17 F.4th 342, 354 (2d Cir. 2021).  When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing to particular parts of materials in the record.  *See* Fed. R. Civ. P. 56(c)(1)(A).  "A party opposing summary judgment normally does not show the existence of a genuine issue of fact to be tried merely by making assertions that are based on speculation or are conclusory."  *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

## III.   DISCUSSION

### A.  Federal Claims

"The three required elements of an antitrust claim are (1) a violation of antitrust law; (2) injury and causation; and (3) damages."  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) (cleaned up); *accord In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 550 (S.D.N.Y. 2021).  Defendants' motion for summary judgment is granted because, based on the record evidence, no reasonable jury could find that the alleged conspiracy caused injury to Plaintiffs.  It is therefore unnecessary to reach the question of whether any injury suffered by Plaintiffs is sufficient to confer antitrust standing.  *See Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 98 (2d Cir. 2022) (discussing requirements of antitrust standing).

### 1. Plaintiffs Nypl and Rubinsohn

Defendants are granted summary judgment on Nypl and Rubinsohn's claims because no reasonable jury could find that either Plaintiff made a qualifying transaction. It is undisputed that neither Nypl nor Rubinsohn physically received euros purchased with U.S. dollars at one of Defendants' branches in the U.S. Plaintiffs quibble over the definition of "purchase" and cite generally to Nypl and Rubinsohn's deposition transcripts without identifying any evidence that Nypl or Rubinsohn actually made a physical purchase in any U.S. branch of any Defendant bank. While courts need not go "hunting for truffles buried in . . . the record," a review of the portions of the transcripts submitted with Plaintiffs' motion papers reveals no such evidence. *See Westcon Grp., Inc. v. CCC Techs., Inc.*, No. 19 Civ. 2303, 2022 WL 4134578, at *3 (S.D.N.Y. Sept. 12, 2022) ("Judges are not like pigs, hunting for truffles buried in briefs or the record." (internal quotation marks omitted)); *see also 725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 456 (S.D.N.Y. 2019) ("Absent additional specificity from Plaintiffs, this Court declines the invitation to sift through the record to divine what facts Plaintiffs seek to establish."). Thus, Plaintiffs have not raised a triable issue of fact as to either Nypl or Rubinsohn's claims.

Plaintiffs also argue that the Court erred in its Order more than four years ago limiting Plaintiffs' claims to those pleaded, i.e., to purchases of physical euros at a U.S. branch. Plaintiffs have not identified a basis for an untimely request for reconsideration or relief from that prior Order. *See* S.D.N.Y. Local Rule 6.3 (requiring that a motion for reconsideration or reargument be served within fourteen days after entry of an order); Fed. R. Civ. P. 60(b)-(c) (requiring motions for relief from an order based on, e.g., "mistake," "newly discovered evidence," or any "fraud" or "misrepresentation" to be filed within one year). In any event, Plaintiffs' arguments mischaracterize the basis for that decision. The limitation of Plaintiffs' claims to physical

SPA-25

purchases was based on analysis of what claims fairly are encompassed by Plaintiffs' allegations, not on any representations by Defendants.

### 2.  Plaintiffs McCarthy, Mad Travel, Jolly and Go Everywhere, Inc.

Defendants are granted summary judgment on the claims of McCarthy and Jolly, and their respective businesses Mad Travel and Go Everywhere, Inc., because no reasonable jury could find that they made any of their transactions at supracompetitive prices.  Unlike Nypl and Rubinsohn, Plaintiffs McCarthy and Jolly testified that they purchased physical euros with U.S. dollars at U.S. branches of one of the Defendant banks, JPMC, on their own behalf and on behalf of their respective businesses.  McCarthy made qualifying purchases "on occasion" but does not recall when or how often, nor does she have receipts.  Jolly made qualifying purchases several times per year, though she has receipts for purchases only on four specific days.  Defendants' motion is granted because there is no evidence in the record that the prices Plaintiffs paid on those days -- or on any particular day that they might have traded, whether supported by documentation or not -- were inflated by the alleged conspiracy and thereby caused any injury to Plaintiffs.[1]

### a.  Evidence of Antitrust Violation and Damages

In opposition to Defendants' motion, Plaintiffs continue to rely heavily on certain guilty pleas and other orders issued in regulatory proceedings.  Several Defendants pleaded guilty to engaging in -- and/or were found by regulatory agencies to have engaged in -- a conspiracy to

---

[1] Defendants argue at length that McCarthy and Jolly lack documentation to show that they made specific transactions on specific days, such as receipts.  To be clear, such documentary evidence is not required to survive summary judgment, nor would it necessarily be required at trial.  Plaintiffs could proffer other evidence of when they made certain transactions, such as their own testimony.  However, the record shows that no such evidence could be offered at trial, since Plaintiffs do not recall any qualifying transactions other than those for which Jolly has receipts.  Therefore, and for the reasons that follow, no reasonable jury could find by a preponderance of the evidence that those transactions or any other was affected by Defendants' alleged conduct.

manipulate benchmark rates and other aspects of FX spot market pricing.  Pursuant to 15 U.S.C.

§ 16, final judgments in government antitrust enforcement actions are "prima facie evidence"

against the defendant in later civil cases "as to all matters respecting which said judgment or

decree would be an estoppel as between the parties thereto."  Whether under ordinary equitable

estoppel principles or § 16, the guilty pleas and regulatory orders may create a triable issue of fact

on one or more of the elements of Plaintiffs' claims.  But even so, and even assuming that all of

the Plaintiffs' documentary evidence is admissible at trial, the pleas and orders are insufficient to

survive summary judgment on the injury element.

Plaintiffs argue at length that they have established an antitrust violation and that they

need not prove damages with specificity at this stage.  For instance, it can be assumed that certain

Defendants' admissions to engaging in an antitrust conspiracy establish the first element of

Plaintiffs' claims -- i.e., that those Defendants committed an "antitrust violation" on each day that

the conspiracy existed, including the days McCarthy and Jolly bought euros.  *See, e.g.*, *Smith v.

United States*, 568 U.S. 106, 111 (2013) ("Since conspiracy is a continuing offense, a defendant

who has joined a conspiracy continues to violate the law through every moment of the

conspiracy's existence." (cleaned up)); *United States v. Socony-Vacuum Oil. Co.*, 310 U.S. 150,

227 (1940) ("A conspiracy thus continued is in effect renewed during each day of its

continuance." (internal quotation marks omitted)).  It also can be assumed that, if Plaintiffs could

prove the *fact* of damages, even an approximate *calculation* of damages would suffice to survive

summary judgment and go to trial on the third element of Plaintiffs' claim.  *See Eastman Kodak

Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927) ("Damages are not rendered

uncertain because they cannot be calculated with reasonable exactness.  It is sufficient if a

reasonable basis of computation is afforded, although the result be only approximate." (internal

quotation marks omitted)); *accord Baker v. Weber*, No. 19 Civ. 1093, 2022 WL 3589095, at *3

(S.D.N.Y. Aug. 23, 2022), *report and recommendation adopted*, 2023 WL 199009 (S.D.N.Y. Jan. 17, 2023).

However, Plaintiffs have put forward no evidence on the second element of their antitrust claims -- i.e., whether the conspiracy caused injury to Plaintiffs.  Contrary to Plaintiffs' argument, the fact that the alleged price-fixing conspiracy is *per se* illegal does not absolve Plaintiffs of the burden to prove that they were injured by the conspiracy.  The *per se* standard eases Plaintiffs' burden on the element of antitrust violation, but that is separate from the element of injury.  *See Cordes*, 502 F.3d at 105 ("There is no controversy here regarding the first . . . element.  Horizontal price-fixing agreements are *per se* violations of the Sherman Act. . . .  The second element -- whether termed 'antitrust injury,' 'causation or impact,' or 'injury and causation' -- is more complicated.").  The *per se* rule also may be relevant to part of the test for antitrust injury, but it does not relieve Plaintiffs of the burden to prove that they were harmed.

The injury element of an antitrust claim "poses two distinct questions": (1) "the familiar factual question whether the plaintiff has indeed suffered harm, or 'injury-in-fact'" and (2) "the legal question whether any such injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Id.* at 106.  That is, *if* Plaintiffs could prove that they suffered *any* kind of injury in the form of higher prices, they could likely prove that they suffered "antitrust injury," i.e., the kind of injury the antitrust laws guard against.  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) ("Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer [an antitrust injury.]").  That may be so even if the conspiracy does not eliminate *all* competition from the market, even if some market forces still affect the price, and even if the defendants might argue that the prices are nonetheless "reasonable" in some sense.  *Id.* at 772-74.  But that entire inquiry is moot if the plaintiffs were not actually harmed by the prices

they paid.  The existence of a price-fixing conspiracy "constitutes strong evidence that the alleged agreement caused at least some element of the subsequent price increases," but Plaintiffs still must prove that there *were* price increases at relevant times.  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 67 (2d Cir. 2012); *see also In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 101 (2d Cir. 2017) (noting that "a presumption of causation" may apply where conduct is unlawful because of its tendency to cause a certain injury, but only if "that injury occurred").  That Plaintiffs cannot do on the current record, for the reasons explained below.

### b.  Evidence of Antitrust Injury

The guilty pleas and regulatory proceedings on which Plaintiffs rely say nothing about what effect Defendants' conduct had on the spot price on any particular day or throughout the relevant period.  As the Court held in denying class certification, the guilty pleas establish that the effect of the conspiracy was "multi-directional" and "episodic."  *Nypl*, 2022 WL 819771, at *8.  Plaintiffs argue that the Court erred, at the class certification stage, in finding that the conspiracy *itself* was episodic rather than continuous.  That argument was rejected in the class certification decision, and the deadline for seeking reconsideration has long since passed.  In any event, this argument is based on a misreading of that prior decision.  The class certification decision did not deny that the conspiracy existed throughout the relevant period, or that it was against the law at all times while it existed.  But that does not mean prices were manipulated in any particular direction at any particular time.  The conspiracy's *impact* may be episodic and multi-directional, even though the conspiracy itself is continuous and eliminates competition on a "constant" basis, as one witness testified.  The very documents on which Plaintiffs rely state that the conspiracy raised and lowered prices at different times, and likely had no effect at other times.  Plaintiffs' claims fail because no record evidence provides a basis for a jury to decide in what direction

prices were distorted when Plaintiffs bought euros, and therefore no evidence that Plaintiffs purchased euros at a supracompetitive price.

### i.    Defendants' Guilty Pleas & Regulatory Orders

Defendants' guilty pleas, on their face, describe episodic and multi-directional price manipulation.  For example, certain Defendants admitted in their guilty pleas that they conspired to "increase *or decrease* the price of" euros against dollars.  Those Defendants admitted that they engaged in "near daily conversations" that, "in certain instances" coordinated trading around the "fixes," i.e., the setting of benchmark rates.  The TAC focused solely on alleged manipulation of those benchmark rates, but the Court has since held that the benchmark-fixing was episodic and multi-directional.  Plaintiffs' expert testified that he did not "analyze defendants' conduct for all the days" or indeed "any days" in the relevant period, and he had no opinion on whether the prices on any day were supracompetitive, because he believed that such opinions were relevant only to damages.

Plaintiffs now spread their focus to Defendants' other admitted conduct.  For example, the Defendants that pleaded guilty also admitted to "withholding bids and offers, when one conspirator held an open risk position, so that the price of the currency traded would not move in a direction adverse to the conspirator with an open risk position."  Those pleas, by their terms, describe conduct that is episodic and multi-directional.  That is, the admitted conduct occurred only when a conspirator was exposed to certain risk, and might inflate or depress the price depending on which favored the co-conspirator's open position.

Several kinds of misconduct described in the guilty pleas do not apply to Plaintiffs' claims at all.  Much of the conduct pertains only to transactions "via telephone, email, and/or electronic chat," not to the in-person, physical transactions at issue in this case.  And statements about Defendants' efforts to widen bid/ask spreads are irrelevant because there is no evidence that

Plaintiffs engaged in transactions where prices included a bid/ask spread.  For similar reasons, the recent jury finding that a conspiracy existed to widen bid/ask spreads does not affect the analysis of Plaintiffs' claims.  Plaintiffs refer generally to their expert's supplemental report and deposition and claim he will calculate an "apportionment of the spread between purchase and sale transactions."  Even assuming Plaintiffs' expert could calculate the amount by which the spread was widened in the market for the euros between 2007 and 2013, and allocate that spread between an increase in the ask price and a decrease in the bid price, the deposition and report contain no methodology for connecting *any* such spread to transactions that Plaintiffs actually made.

Other isolated statements in the guilty pleas on which Plaintiffs rely are irrelevant.  The fact that the Defendants admitted to referring to themselves as the "Cartel" or the "Mafia" sheds no light on the frequency or direction of manipulation.  And statements to the effect that Defendants' conduct occurred "in a continuous and uninterrupted flow" of interstate commerce are relevant to a different element of Sherman Act liability, the interstate commerce requirement.  Those statements do not suggest that Defendants' actually manipulated prices on a "continuous and uninterrupted" basis, much less that they always moved prices in a particular direction.

Plaintiffs also rely on statements made in other regulatory proceedings, which are similarly unhelpful to Plaintiffs.  Statements by the Board of Governors of the Federal Reserve, that certain Defendants entered "agreements . . . to coordinate FX trading in a manner designed to influence . . . benchmark fixes and market prices generally," do not suggest that those agreements fixed "market prices generally" in any particular direction at any particular time.  The Commodity Futures Trading Commission orders state that manipulative conduct occurred only "at times" during the relevant period and that the defendants "altered trading positions to accommodate the interests of the collective group, and agreed on trading strategies as part of an

effort by the group to attempt to manipulate certain FX benchmark rates, *in some cases downward and in some cases upward*." And orders of the Office of the Comptroller of the Currency contain no detail on the alleged misconduct.

### ii.    Evidence of the Amount of Harm Caused

In the absence of evidence about the conspiracy's effect on the spot price on any particular day, Plaintiffs rely on the Department of Justice's calculation of the fines that it recommended in connection with the guilty pleas. Plaintiffs rely on the "estimation that the alleged misconduct had, on average, changed the 1:15 pm ECB and 4:00 pm WM/R fixing rates for EUR/USD by three pips during the period between 2008 and 2012." Even assuming that estimate is competent evidence of the average impact in absolute terms on those benchmarks, and even assuming those benchmarks played a role in calculating the prices Plaintiffs paid, DOJ's calculation is no evidence of how much prices were inflated on any given day. "Three pips" is an estimate of how much the benchmark rates had been "changed" "move[d]" or been "[a]ffect[ed]" -- up or down -- not how much they were inflated. *See* Def. Citi's Resp. to Pl.'s 4th Interrog., App. at 2, 4; Def. JPMC's Resp. to Pl.'s 4th Interrog., App. A at 2, 3; Def. Barclays's, Resp. to Pl.'s 4th Interrog., App. A at A-5; Def. RBS's Resp. to Pl.'s 4th Interrog., App. at 1, 2 (Dkt. Nos. 850-14, 850-15). That is, the estimate not only averages effects across individual days, it encompasses both days on which the conspirators inflated and depressed the benchmark rates, according to their interests that day. While some victims of the conspiracy could be harmed no matter which way the price was manipulated, Plaintiffs could only have been injured on days when the price of euros was higher relative to dollars.

Plaintiffs also emphasize comments by the sentencing judge, Judge Underhill, at the time of certain Defendants' guilty pleas. Judge Underhill remarked on the size of the fines, which he believed reflected the seriousness of the offenses. Judge Underhill also mentioned that restitution

would be worked out in civil cases.  Plaintiffs' reliance on those statements misses the mark for several reasons.  First, the fact that civil cases were chosen as the preferred mechanism of making whole the victims of Defendants' conspiracy says nothing about whether *these* Plaintiffs have meritorious claims.  Defendants' choice to defend this lawsuit does not render any guilty plea a "fraud."  Second, the remarks by the sentencing judge about the size of the fines and potential future restitution underscore the inapplicability of the DOJ estimates discussed above.  The DOJ's "three pips" number was used to calculate the fines that DOJ actually imposed on the Defendants that pleaded.  As the sentencing judge acknowledged, that number is wholly separate from calculating any restitution that might be owed to compensate victims.  The latter would have been the function of this lawsuit, if Plaintiffs could have proven compensable injury.

Because there is no record evidence from which a reasonable jury could find that any manipulation of FX spot market prices caused inflated retail prices in any particular transaction, it is unnecessary to resolve the parties' dispute over precisely how those retail prices were calculated and which spot prices or benchmarks factored into that calculation.

## B.  California Claims

Defendants' motion for summary judgment is granted on Plaintiffs' California Cartwright Act claims for substantially the reasons discussed above, and for the independent reason that Plaintiffs abandoned these claims.  Case law interpreting the federal antitrust laws is "instructive, not conclusive, when construing the Cartwright Act."  *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 120 (2d Cir. 2021) (internal quotation marks omitted).  In many respects, but not all, "[t]he analysis of claims brought under California's Cartwright Act 'mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act."  *Fed. Trade Comm'n v. Shkreli*, No. 20 Civ. 706, 2022 WL 135026, at *43 (S.D.N.Y. Jan. 14, 2022) (quoting *County of Tuolomne v. Sonora Cmty. Hosp.*, 236 F.3d 1148,

1160 (9th Cir. 2001)).  At a minimum, "resulting damage" from a conspiracy in restraint of trade is an element of a Cartwright Act claim.  *See, e.g.*, *Ben-E-Lect v. Anthem Blue Cross Life & Health Ins. Co.*, 265 Cal. Rptr. 3d 495, 501 (2020).  That element is not met for the same reasons discussed above that the causation and injury elements of a federal antitrust claim are not satisfied.

In any event, Defendants argue that the Cartwright Act does not apply to any of Plaintiffs' claims because none of them have "significant contacts with California, such that their claims predominantly arose here, and gave rise to a significant interest on the part of California in applying its laws to" the claims.  *See J.P. Morgan & Co., Inc. v. Super. Ct.*, 6 Cal. Rptr. 3d 214, 233-34 (2003).  Nypl is a California resident, but all of the other Plaintiffs live and do business in either Florida, Texas or Pennsylvania.  McCarthy testified that she made qualifying FX purchases in Florida, and Jolly testified that she made qualifying purchases in Texas.  As discussed above, there is no dispute that the only Plaintiff with a connection to California -- Nypl -- made no qualifying transactions.  Because Plaintiffs failed to respond to Defendants' argument that the Cartwright Act does not apply to any other Plaintiff's claims, Plaintiffs have abandoned those claims.  *See, e.g.*, *Townsquare Media, Inc. v. Regency Furniture, Inc.*, No. 21 Civ. 4695, 2022 WL 4538954, at *20 (S.D.N.Y. Sept. 28, 2022).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted.  The request for oral argument is denied as moot.

The Clerk of Court is directed to close the motion at Dkt. No. 806 and close the case.

Dated: March 29, 2023
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
JOHN NYPL, et al.,

                            Plaintiffs,

           -against-                                 15 **CIVIL** 9300 (LGS)

                                                  **JUDGMENT**

JP MORGAN CHASE & CO., et al.,

                            Defendants.

-------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated March 30, 2023, Defendants' motion for summary

judgment is granted. The request for oral argument is denied as moot; accordingly, the case is

closed.

**Dated:** New York, New York

        March 30, 2023

                                       **RUBY J. KRAJICK**

                                _____

                                       **Clerk of Court**

**BY:**        K. Mango

                                    _____

                                       **Deputy Clerk**

# ALIOTO LAW FIRM

ONE SANSOME STREET
35TH FLOOR
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE (415) 434-8900
FACSIMILE (415) 434-9200

April 11, 2023

***Via ECF***

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

Re:   *John Nypl, et al. v. JP Morgan Chase & Co et al.,* No. 15-cv-9300 (LGS)

Dear Judge Schofield:

Pursuant to the Local Rules of Court and this Court's Individual Rules, the Plaintiffs hereby respectfully seek leave of Court to file a motion to set aside the Judgment pending oral argument. In this Court's decision of March 30, 2023, entering Judgment against the Plaintiffs, the Court concluded its Decision by stating, "The request for oral argument is denied as moot." (ECF No. 855) (ECF No.856).

The grounds for the Plaintiffs' request to file the motion are that the Plaintiffs have a Constitutional right to be heard pursuant to Amendment V of the Constitution of the United States, which states in pertinent part, "No person shall…be deprived of life, liberty, or property without due process of law;…." The Supreme Court has consistently defined due process of law as follows: "due process of law requires not only notice but an opportunity to be heard." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950). The Supreme Court has reaffirmed this definition time and time again. In *Wo_lf v. McDonnell*, 418 U.S. 539 (1974), the Court stated:

> "The Court has consistently held that some kind of **hearing is required** at some time before a person is finally deprived of his property...." *Id.* at 557 (emphasis added).

ALIOTO LAW FIRM
Page 2

To "be heard" is defined by the Oxford online dictionary as follows: (1) to "perceive or become aware of by ear"; (2) to "gain knowledge by hearing"; (3)" directed or perceived by a sense of hearing."

For the reasons above, Plaintiffs respectfully seek the leave of court to file a motion to set aside the Judgment for a hearing.

Respectfully submitted:

**ALIOTO LAW FIRM**

By: /s/ Joseph M. Alioto
    Joseph M. Alioto

cc:    All Counsel of Record via ECF

Application DENIED.  It is "well-settled case law that...[m]otions may be decided wholly on the papers, and usually are."  *Brady v. Associated Press Telecom*, 2017 WL 111783, at *1 n.2 (S.D.N.Y. Jan. 11, 2017) (citing *Greene v. WCI Holdings Corp.*, 136 F.3d 313, 315-16 (2d Cir. 1998)).  While Plaintiffs are correct that due process of law requires not only notice but "the opportunity to be heard," *Mullane v. Central Hanover Bank Trust Co.*, 339 U.S. 306, 314 (1950), the Second Circuit has made clear that "the 'hearing' requirements of Rule 12 and Rule 56 do not mean that an oral hearing is necessary, but only require that a party be given the opportunity to present its views to the court." *See Greene*, 136 F.3d at 316; *accord In re 477 W. 142nd St. Hous. Dev. Fund Corp.*, 2022 WL 2093418, at *11 (S.D.N.Y. June 10, 2022) ("[T]here is no due process right to oral argument.").  Here, Plaintiffs were fully apprised of the pendency of Defendants' Rule 56 motion for summary judgment, and were given the opportunity to present their objections, both in their memorandum of law in opposition to the motion (Dkt. No. 822), and in their sur-reply memorandum of law in opposition to the motion (Dkt. No. 834).

Further, the Court "ordinarily does not hear oral argument" absent a compelling need.  *See* Individual Rules and Procedures for Civil Cases, Rule III(B)(6).  This rule is consistent with the conclusion that "the decision whether or not to hold an oral hearing on [a dispositive motion] lies in the sound discretion of the trial court." *See Greene*, 136 F.3d at 316; *accord United States v. Donziger*, 2021 WL 1820190, at *10 (S.D.N.Y. May 6, 2021).  Plaintiffs offer no indication that oral argument would substantially supplement the arguments made in their motion papers, or would otherwise justify setting aside the carefully considered judgment of the Court.

Dated: April 12, 2023
    New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE